[Civ. No. 3730.   First Appellate District, Division One.—February 8, 1921.]

In the Matter of the Estate of MARY E. TURNER, Deceased. H. S. HERRICK, Appellant, v. J. T. HARMES, Respondent.

[1] ESTATES OF DECEASED PERSONS—DISMISSAL OF PETITION FOR PROBATE OF WILL—NONRESIDENT ALIEN PETITIONER—RIGHT TO RECEIVE DEVISE—ORDER OF DISMISSAL NOT DETERMINATIVE.—An order dismissing a petition for the probate of a will on the ground that the petitioner was a nonresident alien and not a person interested in the estate and that the petition was not signed by the petitioner personally, but by his attorney in fact, was not a determination of the right of the petitioner as a nonresident alien to take by devise under the will.

[2] ID.—NONRESIDENT ALIENS—RIGHT TO INHERIT REAL ESTATE.—A nonresident alien and subject of Italy is entitled under the "most favored nation" clause of the treaty between the United States and Italy to receive by devise real estate in this state, notwithstanding section 17 of article I of the constitution adopted in 1894.

---

1.   Effect of treaties upon an alien's right to inherit, notes, **Ann. Cas.** 1912A, 1100; 32 **L. R. A.** 177; **L. R. A.** 1915E, 327.

Alien's right to inherit generally, notes, 12 **Am. St. Rep.** 93; 31 **L. R. A.** 177.

[3] CONSTITUTIONAL LAW—INHERITANCE BY ALIENS—POWER OF LEGIS-
LATURE.—Section 17 of article I of the constitution, adopted in
1894, is not to be construed as a limitation upon the power of
the legislature to deal with the right of succession of nonresident
aliens to real estate, and the passage of the Alien Land Act of
1913, wherein it is provided all aliens eligible to citizenship may
inherit real property in the same manner and to the same extent
as citizens, except as otherwise provided by the laws of this state,
was within the power of the legislature.

APPEAL from a decree of partial distribution of the
Superior Court of the City and County of San Fran-
cisco.  George A. Sturtevant, Judge.  Affirmed.

The facts are stated in the opinion of the court.

H. S. Herrick, *in pro. per.* for Appellant.

Charles A. Christin and Hutchinson, Van Fleet & Chris-
tin for Respondent.

U. S. Webb, Attorney-General, and Frank L. Guerena,
Deputy Attorney-General, for State of California.

RICHARDS, J.—This is an appeal from a decree of
partial distribution made and entered in the matter of the
estate of Mary E. Turner, deceased.  The appellant is the
brother and heir of said decedent and is also one of the
distributees under the decree of partial distribution from
which this appeal has been taken.  The respondent is the
administrator with the will annexed of the estate of said
decedent.  By the terms of said will certain real property
in San Francisco was devised in equal undivided shares to
her said brother and to one A. Basletta.  There was also
devised to Basletta the whole of certain real estate in the
county of Fresno.  The record shows that a petition for
letters of administration with the will annexed was made
on behalf of said Basletta, but that upon a hearing thereon
said petition was dismissed by the court.  Thereafter the
respondent Harmes applied for and received letters of ad-
ministration with the will annexed in said estate.  There-
after and on January 8, 1920, the court having jurisdiction
of said estate made and entered a decree of partial distribu-
tion upon the application of said Herrick, wherein it was

ordered that there be distributed to said Herrick an un-
divided one-half of certain real estate in San Francisco
devised to him by the terms of said will. It was further
provided in said decree that before said Herrick should re-
ceive said property he should execute and deliver to the
administrator with the will annexed a bond in the sum of
two thousand dollars with proper sureties to be approved by
a judge of said court, conditioned for the payment when
required of his proportion of the debts due from said estate.
Thereafter and on February 4, 1920, another petition for
partial distribution was presented by the said administrator
wherein no reference was made to the prior petition for
and decree of partial distribution, but wherein, after re-
citing at considerable length the previous proceedings in
said estate, and setting forth in full the terms of the will of
said decedent, and of the several contests and controversies
which had occurred as between said Herrick and said ad-
ministrator and other persons, involving the right to admin-
ister said estate, and also apparently involving the question
as to the right of said Basletta to have and receive any por-
tion of said estate as one of the devisees of said decedent,
the administrator prayed for a decree of partial distribution
awarding an undivided one-half interest in the real estate
of said decedent, situate in San Francisco, to said Herrick,
and an undivided one-half interest in the same property to
A. Basletta, and also praying that the whole of the lot
lying in Fresno be distributed to said Basletta. This pe-
tition came regularly on for hearing, whereupon said Her-
rick presented his opposition to the same, in so far as it
prayed for the distribution of any portion to said Basletta,
upon the ground that as a nonresident alien and a subject
of Italy he was not entitled to take by devise any portion
of said estate. In his said objections to said petition no
reference was made by Herrick to the fact that the court
had previously made a decree of partial distribution of the
undivided one-half of the San Francisco property referred
to in the petition of said administrator to him. Upon said
hearing the court refused to sustain the several objections
urged by said Herrick against the partial distribution of
said estate, according to the prayer of said petition, and
thereupon proceeded to distribute, in accordance with the
terms of the will of said deceased, an undivided one-half

interest in the San Francisco real estate to said Herrick, and an undivided one-half interest therein to said Basletta, and further proceeded to distribute to the latter the whole of the Fresno real estate, conformably to the terms of said will.

Up to the time of the making and entry of this decree no bond had been filed by said Herrick in conformity with the requirements of the former decree of partial distribution of an undivided one-half interest in the San Francisco property to him; but a few days after the making and entry of the last decree of partial distribution he filed said bond, and thereafter took an appeal to the supreme court from said last made decree of partial distribution, which appeal the supreme court at a later date transferred to this court for hearing and determination.

The appellant presents three points upon this appeal. The first of these is that the trial court determined the right of A. Basletta as a nonresident alien to receive by devise any portion of the estate of Mary E. Turner, deceased, by its order dismissing the petition filed on behalf of A. Basletta for the probate of the will of said deceased and for the issuance to him of letters of administration therein.

The order of said court upon which the appellant relies in support of this contention reads as follows:

"This cause coming on regularly to be heard this 23d day of September, 1918, upon the motion of H. S. Herrick, proponent of the last will of said deceased, and said proponent A. Basletta being represented by counsel on said motion, and it appearing to the court that said A. Basletta is a nonresident alien, and not a person interested in the estate of said deceased, and his said petition for the probate of the last wills of said deceased was not signed by him personally, in accordance with the requirement of section 1371, Code of Civil Procedure, but by his attorney in fact J. T. Harmes;

"It is hereby ordered that said petition for probate so filed by said Basletta be and the same is hereby dismissed."

The parties to this appeal have, for some reason, not seen fit to furnish this court with any of the proceedings in said estate prior to the making and entry of this order; but so far as we are able to determine from the face thereof and from certain indirect references made thereto in other and

later proceedings, it would appear that the only matter passed upon by the court in making said order was the right of said A. Basletta to have his petition for the probate of said will and for the issuance to him of letters of administration with the will annexed granted; and that the only determinative part of said order is the concluding portion thereof, in which it is ordered that said "petition for probate so filed by said Basletta through his attorney in fact be and the same is hereby dismissed." That sufficient basis existed for the making of this order cannot be questioned, for the reason that under section 1369 of the Code of Civil · Procedure, the said A. Basletta, not being a *bona fide* resident of the state, was not competent nor entitled to act as an administrator in said estate, and for the further reason, as expressly stated by the court, his petition for such letters was not properly signed under the requirements of section 1371 of the Code of Civil Procedure. [1] So far as appears upon the face of this order, or so far as appears from the record in the case, the question of the right of A. Basletta as a nonresident alien to take by devise under the will of said decedent was not before the court and was not decided by it at the time of making said order or according to its terms. That this was apparently the view of this matter taken by the trial court is evident from its later action in awarding A. Basletta the share of said estate devised to him by the will of said decedent in the decree of partial distribution, from which this appeal is taken, and when the direct question of the right of A. Basletta as a nonresident alien to take by said devise was presented to said court for determination. We find, therefore, no merit in the appellant's said contention.

[2] The next contention urged by the appellant is that said A. Basletta, as a nonresident alien and subject of Italy, is not entitled, under the constitution and laws of this state, to receive by devise any portion of the real estate of said decedent, and hence that the decree of partial distribution from which this appeal has been taken, in so far as it purports to distribute to said Basletta any property whatever of said decedent, is void. In making this contention the appellant, in his brief, concedes that at the time of the death of said decedent and also at the time of making said decree of partial distribution there existed a treaty

between the United States and Italy in which what is known as the ''most favored nation'' clause appeared; but the appellant contends that notwithstanding the existence of said treaty and the presence and effect of said clause therein, the constitution of this state, by virtue of the amendment of section 17 of article I thereof, adopted in 1894, must be held to override said treaty and must be construed as denying to nonresident aliens the right to take and hold by succession or devise, real estate in California.

We are of the opinion that this court is concluded from attempting to determine either of these two contentions in the appellant's favor by the decision of the supreme court of this state, in the case of *Blythe* v. *Hinckley,* 127 Cal. 431, [59 Pac. 787]. That case involved the right of a nonresident alien, a citizen and subject of England, to take by inheritance real estate in California. The supreme court, in passing upon that question, held, first, that the treaty-making power of the federal government with respect to the rights of aliens to inherit property was of controlling force, and that the laws of the individual states upon that subject, in so far as they were in conflict with the treaty provisions, were suspended or controlled during the life of the treaty.

It is true that in that case it appeared that the treaties between Great Britain and this country were silent upon that subject, but notwithstanding this fact, the supreme court there decided that the laws of the several states were subject to treaty control. It is not contended by the appellant herein that the subjects of Great Britain and of a number of other foreign powers were not accorded the right under treaties existing at the time of the death of said decedent and at the time of the making and entry of the decree herein appealed from, to take real estate by inheritance or devise in this state. In point of fact, the authorities cited in his brief, notably the case of *Succession of Rixner,* 48 La. Ann. 552, [32 L. R. A. 177, and notes thereto, 19 South. 597], show the existence of such rights under a number of existing treaties between the United States and foreign powers; while in the case last referred to as cited by the appellant himself, it is held that a nonresident alien and citizen and subject of Italy is entitled by the ''most favored nation'' clause of the Italian treaty to be accorded the same rights of inheritance and succession which the

citizens and subjects of other nations under the express terms of the treaties therein referred to enjoy.

We are, therefore, constrained to hold that the language of the supreme court in *Blythe* v. *Hinckley,* above referred to, determines this point against the appellant's contention.

[3] It is further claimed by the appellant that the amendment of section 17 of article I of the state constitution, adopted in 1894, has the effect of superseding the decision referred to, and was in fact adopted with the express intent of so doing. It is to be noted that the case of *Blythe* v. *Hinckley, supra,* was decided by the supreme court six years after the date of said amendment; and it may be inferred that if any such change in the constitution as is herein contended for had been effected by said amendment the supreme court would have so declared; but instead of doing this it appears that the court in its decision in said case also dealt with the question as to whether section 17 of article I of the constitution was intended to be a limitation upon the powers of the legislature to deal with the question of the right of succession of nonresident aliens to real estate; and in so doing the court expressly held that the constitutional provision in question was not to be construed as being such a limitation. A cursory examination of section 17 of article I of the constitution, as amended in 1894, will show that it does not expressly prohibit nonresident aliens, eligible to become citizens of the United States under the naturalization laws thereof, from acquiring by inheritance or devise real estate, but apparently leaves it to the legislature to determine the extent and conditions under which such aliens may hold and dispose of such real estate,. as shall be thus acquired by them after the adoption of said amendment. The legislature of California, acting, apparently, upon this construction of the state constitution, adopted, in 1913, an Alien Land Act (Stats. 1913, p. 206), wherein, in section 1 thereof, it is provided that "All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit and inherit real property or any interest therein, in this state, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state." We are of the opinion that the state legislature was empowered to pass this provision; and that having done so prior to the

death of said decedent, and said statute being in force at the time of her death, she was entitled by her last will and testament to devise to A. Basletta the portion of her real estate assigned to him by the terms of said will.

The third and final contention of the appellant is that since the trial court by its decree of partial distribution, made on January 8, 1920, distributed to him an undivided one-half of the San Francisco real estate of said decedent, and that since its decree of partial distribution made and entered on March 17, 1920, also distributed to him an undivided one-half interest in the same property, he is entitled to the whole thereof under said decrees, or at least that the second of said decrees was in error in awarding to A. Basletta an undivided one-half of said property, since the court thereby attempted to dispose of more by one-half than the whole thereof.

We find no merit in this contention, since aside from the fact that up to the time of the making of said second decree the appellant had not complied with the requirement of the first decree in the matter of filing the bond provided for therein; and also since in his opposition to the making of said second decree he altogether failed to refer to the fact that he had already received an undivided one-half of said property by said former decree, we are of the opinion that these two decrees should be construed together, and that when so construed it must be held that it was not the intention of the trial court to do otherwise than to dispose of the real estate of said decedent, in conformity with the terms of her will, and hence by its second decree to assign to the appellant no more than that share of said property which he had been declared entitled to receive upon the accomplishment of the yet unfulfilled requirements of the first decree. This being our construction of said decrees it follows that there is no merit in the appellant's contention as to the effect of said decrees.

Judgment affirmed.

Kerrigan, J., and Waste, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 10, 1921, and the following opinion then rendered thereon:

THE COURT.—The petition for rehearing presented by the attorney-general herein is denied.

The case of *Blythe* v. *Hinckley*, 127 Cal. 431, [59 Pac. 787], cited in the main opinion herein, was not referred to as one involving the question of the right of the alien therein concerned to inherit real estate in California under a treaty provision, but was relied upon for the reason that the supreme court did expressly declare in that case that state laws "in so far as they are in conflict with treaty provisions are suspended or controlled during the life of the treaty." It is not the province of this court to treat as *dicta* and disregard as such this express declaration of the supreme court.

The case of *Sullivan* v. *Kidd*, 254 U. S. 433, [65 L. Ed. 344, 41 Sup. Ct. Rep. 158], cited by the petitioner, does not, in our opinion, sustain his contention as to the effect of the "most favored nation" clause in treaties upon state statutes undertaking to regulate or restrict the inheritance of real estate by nonresident aliens.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 7, 1921.

All the Justices concurred, except Sloane, J., who was absent.

---

[Civ. No. 3421.   Second Appellate District, Division One.—February 8, 1921.]

In the Matter of the Estate of WILLIAM KAFITZ, Deceased. LIZZIE MIGEOT et al., Appellants, v. CHARLES H. McGWIRE, as Special Administrator, etc., Respondent.

[1] ESTATES OF DECEASED PERSONS — UNAUTHORIZED DISPOSITION OF PROPERTY BY SPECIAL ADMINISTRATOR — COMPENSATION FOR SERVICES—RETURN OF PROPERTY OR PAYMENT OF VALUE.—A special administrator who without authority and without right parted with the possession of personal property belonging to an estate should be charged therewith and his estate should not be permitted to

retain as compensation for his services any part of the funds of the estate until the property is returned to the executors, or, in lieu of such return, the allowed compensation should not be permitted to be paid until the estate has received the value of the property.

[2] ID.—ASSISTANCE TO CONTESTANT OF WILL—RIGHT TO COMPENSATION.—A special administrator who has cared for and accounted for substantially all of a large and valuable estate is not to be totally deprived of compensation for his services because at the same time, with strong partisan bias and by the use of all the means in his power, he was aiding one of the claimants to an interest in the estate in her efforts to maintain and establish her claim.

[3] ID.—RIGHT OF ATTORNEY'S FEES.—An attorney is not to be totally deprived of fees for services rendered a special administrator because he also, and at the same time, was acting as attorney for one of the claimants in a contest over the will of the deceased person whose property was then in the possession of the special administrator.

[4] ID.—ATTORNEY'S FEES—SERVICES RENDERED SPECIAL ADMINISTRATOR—DIRECT ALLOWANCE.—In view of section 1616 of the Code of Civil Procedure, attorney's fees for services rendered a special administrator may be allowed directly to the attorney.

APPEAL from an order of the Superior Court of Los Angeles County settling account of special administrator. James C. Rives, Judge. Reversed.

The facts are stated in the opinion of the court.

J. L. Murphy and Oscar Lawler for Appellants.

Joseph Scott, Willedd Andrews and A. G. Ritter for Respondent.

CONREY, P. J.—Appeal from an order settling the first and final account of Charles H. McGwire as special administrator.

Appellants appeared as persons interested in the estate as heirs at law and residuary legatees, and also as executors of the last will and testament of decedent, and filed their exceptions in writing to the account. They personally have taken this appeal.

On November 27, 1918, special letters of administration were issued to McGwire. On November 29th appellants

filed their petition for probate of the will of decedent. The will was contested by Maud M. Kafitz, surviving wife of the decedent. In an action for divorce, wherein William Kafitz was plaintiff and Maud M. Kafitz defendant, an interlocutory decree had been entered less than one year before the death of William Kafitz, and, therefore, a final decree of divorce had not been entered. After trial the will was admitted to probate in May, 1919, and appellants were appointed executors thereof. On December 2, 1918, appellants filed a petition for removal of the special administrator which petition, after hearing, was, on the twenty-seventh day of December, 1918, denied. On April 25, 1919, petitioners filed a second petition for removal of the special administrator. This was set down for hearing on July 16th and thereafter continued until September 11, 1919. Prior to September 11th, and while under arrest and charged with the commission of a crime, McGwire came to his death by suicide. His estate was represented at the hearing on said account and on the exceptions thereto, and the order of settlement of the account was made December 12, 1919. The value of the property accounted for by the special administrator was about $88,000.

The exceptions to the account were based upon the stated ground that the special administrator failed to account for all of the property received by him, and in particular that he allowed Mrs. Kafitz to take and appropriate to her own use certain items of said property. It was further objected that the claim of the special administrator for an allowance of $1,000 for his services and for an allowance of $1,000 as fees for his attorney were exorbitant, and that no allowances for those purposes should be made. The court, in its order, decided that the special administrator has turned over to the executors all of the property of the estate except the sum of $2,500; that it was necessary for the special administrator to seek frequent advice of his attorney in connection with his administration; that the sum of $750 each is a reasonable fee for the special administrator and his attorney. Thereupon the court provided that out of the moneys remaining in the hands of the special administrator, or his successors, "$750 shall be allowed as attorney's fees to Joseph Scott and said special administrator shall retain as his commission allowed by law for his services $750," and

directed the distribution of the remaining $1,000 to the executors.

Appellants claim' that the evidence was insufficient to support the court's decision that the special administrator has turned over to the executors all of the property except $2,500 in this, that the evidence showed, without substantial conflict, that the special administrator had in his possession, belonging to the estate, certain personal property of the proved value of $113.50, for which he has failed and refused to account. It is also contended that the court erred in making any allowance for compensation for services of the special administrator or his attorney.

Counsel for appellants say: "Our contention is that the special administration was conceived and carried on, not in the interest of the estate and whoever might be ultimately adjudged entitled thereto, but as a means whereby a part of the property of the estate might be, and was, unlawfully passed to Maud M. Kafitz, as an instrumentality for assisting the latter and the special administrator in attempts to intimidate and corrupt prospective witnesses in the contest between said Maud M. Kafitz and the executors and the beneficiaries under the will which she was contesting." Then follows a *résumé* of the facts, which they claim appear by the record herein affecting the conduct of the special administrator.

[1] Concerning the amount of property not accounted for, appellants contend that the undisputed facts show willful and wrongful disposition thereof. The evidence does show, without conflict, that this property belonged to the estate of William Kafitz, deceased, and not to his wife. But assuming this to be the fact, and further assuming that Mrs. Kafitz's conduct and the conduct of McGwire in his methods of assisting her in her contest against the will of decedent deserves the most severe criticism, this is not alone sufficient to have compelled the court to find bad faith on the part of the special administrator in allowing her to take possession of these small items of personal property which were claimed by her. Nevertheless, having, without authority and without right, parted with personal property belonging to the estate, the special administrator should be charged therewith, and his estate should not be permitted to retain as compensation for his services any part of the

funds of the estate until said property is returned to the executors; or, in lieu of such return, the allowed compensation should not be permitted to be paid until the estate has received the value of said property. We do not overlook the fact that appellants claim that there was other property of the estate not accounted for by the special administrator. As to such other property, however, the evidence was not conclusive, and this court must, therefore, assume that said items, amounting to $113.50, constituted all of the property not accounted for.

Referring now to the more general charge that throughout his administration the special administrator acted in fraud of the law, in antagonism to the beneficiaries of the trust, and for the advantage of himself and Maud M. Kafitz, it appears from the evidence that in the contest which ended in the admission of the will to probate, Joseph Scott appeared and acted as attorney for the contestant, and at the same time he appeared and acted as attorney for the special administrator throughout the proceedings relating to the special administration. It further appears that McGwire, while acting as special administrator, was also actively aiding Mrs. Kafitz in her contest of the will. While many of the facts charged against McGwire and against Mrs. Kafitz in the affidavits in this proceeding are disputed, enough appears to show beyond controversy that McGwire was a strong partisan of Mrs. Kafitz in the will contest, and the evidence strongly tends to show the use by him of unjustifiable and wicked methods in his actions concerning said contest. From these facts two questions of law arise: First, may a special administrator who has cared for and accounts for substantially all of a large and valuable estate be totally deprived of compensation for the services thus rendered because he was at the same time, with strong partisan bias and by the use of all means in his power, aiding one of the claimants to an interest in the estate in her efforts to maintain and establish that claim? Second, must an attorney be totally deprived of fees for services rendered to a special administrator when and because he also and at the same time was acting as attorney for one of the claimants in a contest over the will of the deceased person whose property was then in possession of the special administrator? A third and minor question incidentally arises: May an attorney's

fee for services rendered to a special administrator be allowed directly to the attorney, or must such allowance be made to the special administrator as an expense incurred by him, on showing that it was necessary for him to employ an attorney to assist him in the performance of his official duties?

[2]   On the first question it is our opinion that under the circumstances stated the special administrator remains entitled to just compensation for the services rendered by him. It is to be presumed that in fixing the amount of such compensation the court confined itself to the value of the services of the special administrator in his official capacity, and did not allow him for other services rendered to a party to the will contest. Since, in fact, the administrator was not removed by the court, the amount of his compensation should not be reduced for any cause other than misconduct directly affecting his care of the property in his charge.

[3]   The second question is answered by the decision of the supreme court in *Estate of Healy,* 137 Cal. 474, 478, [70 Pac. 455] : "In a controversy between the heirs of a decedent upon a matter in which the administrator has no interest, and which does not affect his relation to the estate in his hands, the attorney for the administrator violates no obligation to his client by acting as attorney for one of the heirs as against the others. (See *Jones* v. *Lamont,* 118 Cal. 499, [62 Am. St. Rep. 251, 50 Pac. 766].) Correlatively, and for the same reason, the administrator violates no obligation to his trust by continuing to retain such attorney in his service." Formerly it was the rule in this state that whatever allowance is to be made from the estate for the services of the attorney of an executor or administrator must be made to the executor or administrator and cannot be made to the attorney. (*Estate of Kruger,* 143 Cal. 141, [76 Pac. 891].) Since that decision, and others there cited, statutory amendments have been made which indicate a change in the policy of the law. Section 1616 of the Code of Civil Procedure now provides that an attorney who has rendered services to an executor or administrator may, upon notice and during the administration, apply for, and upon appropriate showing obtain, an order requiring the executor or administrator to pay to him, out of the estate, compen-

sation on account of services rendered by him. Section 1619 of the Code of Civil Procedure provides for payment to be made directly out of the estate to attorneys for executors and administrators. [4] Since the law concerning the payment of fees of attorneys for executors and administrators has thus been changed, we perceive no reason why allowance to attorneys for special administrators should not now be made in the same manner.

Applying to this case the law as hereinbefore stated, we are unable to sustain the contention of appellants that the court below erred in allowing compensation to the special administrator and to his attorney, or that the amounts fixed by the court are exorbitant. The determination of the sums thus to be allowed is vested in the superior court and should not be interfered with on appeal unless there appears to have been a manifest abuse of discretion.

Solely upon the ground that the evidence proved, without contradiction, that personal property of the estate to the value of $113.50 has not been accounted for by the special administrator, the order is reversed, with directions that the superior court proceed to settle the account in accordance with this decision.

Shaw, J., and James, J., concurred.

---

[Civ. No. 2265. Third Appellate District.—February 8, 1921.]

## RIVER FARMS COMPANY OF CALIFORNIA, Respondent, v. JOHN BORGES et al., Appellants.

[1] VENDOR AND VENDEE—ACTION FOR INSTALLMENT OF PRICE—SUBSEQUENT ACTION FOR RECOVERY OF PROPERTY—ABSENCE OF ESTOPPEL.—A vendor under a contract of sale of real property does not, by bringing an action for the recovery of an installment less than the whole purchase price, thereby make an election of remedies which estops him from maintaining a subsequent action for the recovery of the property after all the installments have become due.

[2] ID.—VENDEE IN POSSESSION—EJECTMENT—EQUITABLE DEFENSE—DUTY OF VENDEE.—A vendee under a contract of sale and in possession of the property cannot set up against the vendor in an

action in ejectment after all the installments have become due an alleged equity arising out of the contract until he has performed or offered to perform the contract.

APPEAL from a judgment of the Superior Court of Colusa County. Ernest Weyand, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. R. Cunnyngham and McPike & Murray for Appellants.

Thomas Rutledge and Chickering & Gregory for Respondent.

PREWETT, P. J., *pro tem.*—Action in ejectment. Judgment in favor of plaintiff and respondent. The defendants appeal. The plaintiff claims title as grantee of the Yolo Land Company. The appellants claim right of possession by virtue of a certain contract of purchase entered into between said Yolo Land Company and appellant, John Borges, on October 1, 1913, whereby the latter was to pay $24,000 for the property in dispute. The sum of $4,800 was then and there paid in money and no other or further payment, except a little interest, has ever been made by Borges or in his behalf. The balance of the purchase price was agreed to be paid as follows: The sum of $3,840 on the first day of October in each of the years 1914, 1915, 1916, 1917 and 1918, together with interest. In order to understand the point of this appeal it is necessary to quote a number of provisions of the contract under which the property was purchased.

The provisions in question follow:

01. "If any of said installments are not so paid, then at the option of the owner, the whole of said principal sum and interest shall become immediately due and payable or all rights of the purchaser under this contract be deemed terminated as mentioned hereinafter."

5. "It is also, expressly understood and agreed between the parties hereto that in all matters and things hereunder to be done, and all payments hereunder to be made, time is and shall be of the very essence of this agreement.

6. "The waiver by the owner, of any breach of covenant or agreement on the part of the said purchaser shall not

be deemed or held a waiver of the terms of this contract making time of the essence thereof as to other payments thereafter falling due.

7. "In the event that any payment remains unpaid for thirty days after the same becomes due according to the terms of this agreement, the owner shall be released from all liability hereunder at law or in equity either to convey the above described real estate or to repay all or any part of the payments made by the purchaser; but in that event all payments made shall be deemed and considered as rent paid for the period before such default and shall be retained by the owner, and all further rights of purchaser under this contract to the payments made or to a conveyance or possession of the real estate shall thereupon terminate and cease; . . . provided, however, that the owner on purchaser's default, may at his option bring an action to foreclose the rights of the purchaser or to recover installments due, according to this clause, either for installments delinquent or for the whole balance of the contract price unpaid.

8. "That each and all of the terms hereof shall inure to the benefit of and be binding upon, the heirs, executors, administrators, successors and assigns of both parties to this contract."

The defense to the action is not based upon any claim that the defendant Borges has complied with the terms of his contract, for it is admitted that he has never paid a cent upon the principal of said purchase price except the $4,800 paid at the date of the contract or a few days thereafter.

[1] The defense is that the Yolo Land Company, by an election of inconsistent remedies, has estopped itself to claim a recovery of the land and is relegated to other remedies. The outstanding fact in the case, then, is that the defendant Borges is claiming the land and withholding the money. It would be a woful injustice if he could do this, and we are not prepared to say that the law either sanctions or permits such a result. To appreciate fully this defense of election of remedies, it is necessary that we examine in detail the several acts relied upon to establish the election and the several alternatives reserved to the seller in the contract of sale.

The installment of October 1, 1914, remaining unpaid, the Yolo Land Company, on August 24, 1915, commenced an action against defendant Borges to recover the same, but the action was dismissed without trial. If, however, the commencement of this action constituted an election, then the subsequent dismissal thereof did not operate as a revocation of the election.

Another installment ripened on October 1, 1915, and on November 9, 1915—more than thirty days after it became due—the Yolo Land Company, in an action brought against it by said Borges, filed an answer and cross-demand setting up said contract and the default as to said two payments that became due respectively on October 1, 1914, and October 1, 1915, and praying judgment in said sums. Thereafter certain persons purporting to be trustees of the creditors and stockholders of said Yolo Land Company filed amended answers setting up the default of defendant Borges as to said two payments and praying judgment accordingly.

On or about the twenty-third day of February, 1918, said trustees filed in said last-mentioned action their amended answer to supplemental complaint therein alleging, among other things, that said Yolo Land Company on or about November 6, 1916, conveyed the premises in question to the plaintiff herein and praying for judgment in the sum of $14,360, but without any statement as to what that sum represented. Said answers and amended answers averred that said Yolo Land Company was dissolved on May 1, 1917, by a decree of court.

It will be noted that the fact and date of the dissolution and the fact and date of the conveyance to the plaintiff are not found by the court and they get into the record only by way of recital in an answer filed in another action. We have no proof that they took place. This appeal is based wholly upon the judgment-roll and we look to that alone for our facts.

It is found by the court that "prior to the commencement of the above-entitled action the said John Borges refused upon tender of a good and sufficient deed to ·said premises to pay the balance of said purchase price or to deliver up and surrender the possession of said premises and has never at any time offered to complete said contract"; and it is, of course, presumed in aid of the unwrit-

ten defense to the allegations of the answer that such finding is properly supported by an implied allegation to like effect. This action was commenced on January 13, 1919, or more than three months after the maturity of the last of the deferred payments. In other words, at the time of the commencement of this action, the defendant, Borges, was completely in default on all his payments and interest save the initial payment and a small sum by way of interest.

At no time was there ever a suit brought for the whole of the purchase price, nor for any part of it except for the first two installments. Much stress is placed by appellant upon the fact that the Yolo Land Company, on November 9, 1915, filed an answer in a suit brought against it by said defendant Borges wherein it set up the default as to the installment that became due on October 1, 1914, and also the installment that became due on October 1, 1915, claiming that the action itself has been commenced some months earlier and before the maturity of said last-mentioned installment. However, the installment was more than thirty days overdue at the time the answer was filed and this is sufficient. But if it were otherwise, we are without light as to the date of the commencement of the suit. It is true that the defendant Borges, in the third paragraph of his third defense, avers that it was commenced on August 31, 1915, but the court failed to find on the point. We must assume in support of the judgment that the appellant submitted no proofs in support of this allegation. (*Mohr* v. *North Rawhide Min. Co.*, 177 Cal. 264, [170 Pac. 600].) The position of the appellants is that the inclusion of an installment not then due could be done only under the forfeiture clauses of the contract permitting the owner to bring an action for the entire purchase price in case any installment was overdue. In view of the state of the record as above outlined, it becomes unnecessary to examine their contention that such inclusion constituted an election of inconsistent remedies.

We have stated that there exists in the record no proof that the Yolo Land Company was ever dissolved. In making this statement we are not unmindful of the fact that the court found, in finding 14, as follows: "That on or about the twenty-fifth day of February 1918, H. C. Morris, Charles Sutro, E. L. Dow, J. F. Humburg and H. A. Kunz,

as trustees of the creditors and stockholders of the Yolo Land Company, filed, etc." But this finding falls far short of a finding that the Yolo Land Company was dissolved. In support of the judgment we may assume that it is yet a subsisting corporation, if such an assumption is necessary.

The court found that defendant Borges had refused upon tender of a deed to pay the balance of the purchase price. In support of the judgment the court will presume that this deed was executed by the proper parties; that the demand was made by the proper parties and in the proper sum, and that these facts were established by competent evidence. Upon this state of the record the judgment must be affirmed, unless the acts of the Yolo Land Company in bringing the first-mentioned action and in filing the answers in the second-mentioned action constituted such an election as estops it and its vendees from claiming the property.

But bringing an action for an installment less than the whole purchase price cannot operate as such an election. The installments were due and the payee had a right to proceed to collect them. This has been held even in an action to recover an installment on the purchase price of personal property. In *Silverstin* v. *Kohler & Chase,* 181 Cal. 51, [9 A. L. R. 1177, 183 Pac. 451], the court, speaking through Mr. Justice Wilbur, says: "There is no difference, in principle, in favor of the purchaser, between such recovery of the installments due, and the payment of those installments by the purchaser without suit. The seller was not, therefore, put to his election between two inconsistent remedies." We are not called upon to determine what would have been the effect had the vendor obtained a judgment for the entire purchase price, for no such judgment was either given or sought.

[2] But even if the findings as to various allegations contained in answers in other actions could be regarded as findings that the matters so alleged are facts, still the appellants would not be entitled to prevail. The defense of the appellants is an alleged equity arising out of the contract in question. In no event can they be heard to assert this defense until they, or at least until Borges, shall have offered to perform. Not only has he not offered to perform, he even affects to show that circumstances have relieved him from the obligation to perform, thus placing himself

in the grossly inequitable position of claiming both the land and the price. But, as above shown, these alleged circumstances are supported only by his allegations that the pleadings in another action aver them to be true.

Courts will not tolerate a principle at once so gross and so at variance with fair dealing. If any authority in support of so obvious a principle were needed, it is found in the case of *Connolly* v. *Hingley*, 82 Cal. 642, [23 Pac. 273], where the court, in an action in ejectment against a vendee in possession, says: "The burden was clearly upon the defendant to sustain the allegations of his equitable defense, and having failed to do so, the finding was properly against him. . . . The plaintiff claims under a deed from Chapman. . . . It is apparent that the defendant can have no greater right against the plaintiff than he had against Chapman. And so far as the possession is concerned he has no equity against Chapman, because he was in default under his contract, without excuse. As was said in *Hannan* v. *McNickle*, 82 Cal. 122, [23 Pac. 271], which is similar in principle: 'The performance of his contract is an essential feature of any equitable defense on his part.' . . . The conveyance to the plaintiff did not relieve him from his obligation to comply with his contract. . . . He was bound to pay someone, and he has not paid anyone, or offered to do so. This prevents him from having any right to equitable relief." A demand upon Borges was found by the trial court, but, since the answer shows that a demand would have been unavailing, it was not necessary to perform the vain act of making one. The claim of appellants that the alleged dissolution of the Yolo Land Company relieved Borges of the duty of performing his contract is scarcely specious. Even if the dissolution had been found by the court, such dissolution would not have worked an extinguishment of the obligation. He would still have owed someone and he made no offer to pay anyone.

The point urged by the appellants that there is no finding as to the value of the use and occupation of the premises arises through inadvertence. The court in finding 4 expressly covers this point.

It does not appear to be necessary for this court to speculate as to the method whereby the plaintiff acquired the title. The court, in finding No. 6, determines that at the

date of the contract the Yolo Land Company was the owner of the property. In finding 2 it is shown that the plaintiff, at the time of the commencement of this action, was and ever since has been the owner thereof. There is no inconsistency in these findings. The evidence in the case is not before us and we are required to assume such a state of the evidence as would justify the findings of the court. Whether the plaintiff acquired the property by mortgage sale, tax title, direct conveyance from the Yolo Land Company, or otherwise cannot affect the result.

The appellants plead the statute of limitations, but they have affirmatively shown that they never claimed by an independent and hostile title, but only as vendees under a contract of purchase which they have not performed or offered to perform.

That the Yolo Land Company or its assignee of its rights under the contract could, if vested with the legal title, eject the appellants would seem to be too plain for discussion, and its grantee stands in at least as good a position. It has been noted, however, that the court has not found that the Yolo Land Company ever conveyed the property to the plaintiff. But it has found, in support of the allegations of the complaint, that the plaintiff was, at the commencement of this action, the owner and entitled to the possession thereof, and this, as we have shown above, is sufficient, and the court will presume such conveyance as may be necessary to support the finding.

The court was under no duty to fix a period within which appellant Borges might perform his contract. He asked no such relief and he did not offer to perform. We find no error that would justify a reversal.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 7, 1921.

All the Justices concurred, except Sloane, J., who was absent.

[Civ. No. 3763.   First Appellate District, Division One.—February 9, 1921.]

In the Matter of the Estate of ANNIE O'CONNOR, Deceased.  JAMES B. HOLOHAN et al., Respondents, v. MAUD McADAM et al., Appellants.

[1] ESTATES OF DECEASED PERSONS—ORDER DENYING PROBATE OF WILL —MENTAL UNSOUNDNESS — CONFLICT OF EVIDENCE — APPEAL. — A judgment refusing to admit a purported will to probate will not be reversed where based upon a verdict reached upon conflicting testimony that the testatrix at the time of its execution was of unsound mind and no substantial errors occurred at the trial.

[2] ID.—EVIDENCE—MENTAL CONDITION PRIOR AND SUBSEQUENT TO ALLEGED TESTAMENTARY ACT.—In a contest to the probate of a will on the ground of mental unsoundness, evidence tending to show the condition of the mind of the testatrix before and after the date of the alleged testamentary act is relevant as bearing upon the mental condition at the time of execution, and such evidence is entitled to such weight as the jury considers it deserves.

APPEAL from a judgment of the Superior Court of Santa Cruz County. Benj. K. Knight, Judge. Affirmed.

The facts are stated in the opinion of the court.

Rea, Cassin & Caldwell for Appellants.

John W. Preston, Chas. B. Younger and Robert Duncan for Respondents.

WASTE, P. J.—This is an appeal by the proponents from a judgment of the lower court refusing to admit to probate a document dated April 25, 1919, purporting to be the last will and testament of Annie O'Connor, deceased. The contest was tried before a jury, which found that while the purported will was not procured through the undue influence of certain of the proponents, as charged by the contestants, Annie O'Connor was not of sound and disposing mind at the time the document was signed by her. This appeal presents the question of the sufficiency of the evidence to support the verdict of unsoundness of mind.

In the lower court, the contestants, who are the respondents here, offered evidence tending to support their con-

tention that Annie O'Connor, by reason of an advanced state of arteriosclerosis, produced by various causes, had been for several months prior to April 21, 1919, seriously impaired mentally. On that day she suffered a severe stroke of paralysis, producing a state of coma, which, the respondents contend, lasted until Mrs. O'Connor's death, and resulted in a condition of complete incompetency, which prevented any normal action on the part of the testatrix during that entire period. The proceedings had and the testimony taken at the trial are presented in a voluminous record. It will be impossible for us to do more than briefly summarize portions of the evidence relied upon by the respective parties to sustain their opposing contentions, and which, in our opinion, not only presents a conflict of testimony, but strongly preponderates in favor of the contestants.

The document which was refused probate was dated the twenty-fifth day of April, 1919, four days after Annie O'Connor suffered a cerebral hemorrhage, from which she died at her home in Watsonville, Santa Cruz County, on the second day of July, following. She was then in her sixty-eighth year. Some four years before the testatrix had executed a will by the terms of which she devised to James B. Holohan fourteen thousand dollars; to Alice Holohan Kelly the sum of five thousand dollars; to Mrs. Mary Jackson, an elderly lady who lived with her, eight hundred dollars; to Margaret Nash eight hundred dollars; to Frances and Gertrude Zills her house and lot in Watsonville; to her cousins, sons and daughters of her uncle, Thomas Pearson, of East 27th Street, New York City, ten thousand dollars; to the Pajaro Valley Orphan Asylum five hundred dollars, and to the superior of the Valley Church, Watsonville, five hundred dollars for masses for herself and family. She named H. S. Fletcher as executor of this will. These provisions appear to have been dictated by the mandates of affection and justice. The relations between the testatrix and the legatees named in the will of 1915 appear to have continued after its execution just as in the past. In the document of April, 1919, offered for probate by the proponents, a number of changes were made. Some of the former legacies were omitted entirely. Others were enlarged or decreased. New devises and bequests were inserted. We do not think it material to our consideration of the appeal

to dwell at length on the situation in which Mrs. O'Connor was placed in the last months of her life, or the circumstances under which the purported will was executed. The issues of unsoundness of mind and of undue influence were submitted to the jury with an offer on the part of the contestants that if the jury reached a verdict of unsoundness of mind, the second issue could be answered in the negative. That was done. As we think the evidence amply supports the finding of the jury that Mrs. O'Connor was of unsound mind at the time of the making of the second will, any reference to changes in the terms of the two wills, or the circumstances of the execution of the questioned instrument, will be only incidental to our consideration of the question presented by this appeal.

Dr. Koepke, who had been Mrs. O'Connor's personal physician for several years preceding her death, testified that during that time she was variously afflicted, having, as the doctor described it, "a complication of troubles which continued all the time." When her physician first treated her in 1912 she complained of a heart lesion, or "leaky heart," resulting from an insufficiency of the mitral valve. There was a perceptible arteriosclerosis or hardening of the arteries, which progressed to the time of Mrs. O'Connor's death. The doctor discovered that she was permanently subject to Bright's disease, and suffered from an incontinence of urine. Feeling unable to relieve his patient, Dr. Koepke ceased visiting her in February, 1919. On April 21st, following, Mrs. O'Connor suffered a cerebral hemorrhage caused by the bursting of a blood vessel in the brain. Dr. Koepke was at once called, and for the next two months saw her almost daily. She was unable during that time to use her left arm and limb, and there was a marked drawing of one side of her face. After the stroke the patient had no power of control of her bowels, and bladder, and their natural functions. From that time also, so far as the doctor observed, she did not initiate conversation on any subject. She paid little or no attention to anything, merely lying quietly and answering "Yes" to any questions asked her. The doctor testified that from the 21st of April, 1919, the day on which Mrs. O'Connor was stricken by the cerebral hemorrhage, until the time he ceased to treat her, on June 25th, following, her condition did not vary, and he gave

as his opinion that Mrs. O'Connor was not of sound mind during that time. He was very firm also in his opinion that she could not have appreciated, known, or understood the contents, or the full import and meaning, of the document she signed.

There is other testimony that, following the stroke of paralysis, Mrs. O'Connor's condition remained almost unchanged; that from that time until her death, two months later, she was irrational, took no interest in any affairs, did not talk, and did not recognize friends whom she had known for many years. This condition, the witness testified, gradually grew worse. Mrs. Kate West, the nurse who took care of the old lady during a part of this period, testified, by deposition, that the patient's mouth was drawn to one side. Sometimes Mrs. O'Connor did not know where she was. She talked very thick, did not articulate well, and could not carry on a connected conversation. Frequently the nurse had to stop the patient from tearing the quilts to pieces. At times, also, Mrs. O'Connor seemed to be trying to sew without a needle. Mrs. Margaret Fahey, an entirely disinterested witness, was called on behalf of the proponents. She had known the deceased for fifteen years. She testified that upon the occasion of a visit she made to Mrs. O'Connor, after the stroke, the old lady did not know her, and the witness had to tell her her name. She appeared dazed and "stared off into space" when the witness attempted to engage her in conversation. In her opinion, Mrs. O'Connor was not of sound mind at that time. Mr. F. A. Kilburn was one of the subscribing witnesses to the will. He was called by the proponents. He testified that Mrs. O'Connor did not initiate any conversation while he was in the house and answered all questions by "Yes" or "No." He made no test of her mentality. He went there to see her sign her name, which she did "rationally." After having testified that, in his opinion, Mrs. O'Connor was "capable" at the time she signed her name to the document, on cross-examination he "was not prepared to say that she was of sound mind at that time."

Mrs. Mary Atteridge, who had known Annie O'Connor for about forty years, visited her on the day, and just prior to the time, the purported will was signed. At that time the old lady was tearing at the quilts on the bed; she did

not speak to the witness, and made no reply to the questions she asked. In Mrs. Atteridge's opinion, the old lady was not of sound mind at that time, and was in the same mental condition when next visited by her, in May, following. Mary Jackson, a friend of the deceased for thirty-seven years, lived in the same house with and assisted Mrs. O'Connor for the eight or nine years preceding the latter's death. Even prior to the stroke, according to this witness, Mrs. O'Connor's mind was failing continually. By the terms of the first will she was left eight hundred dollars. In the document of 1919 she was given one thousand dollars, but she was greatly incensed at the circumstances attending the execution of the latter document at a time when, as she testified, "Mrs. O'Connor could do no business at all," and "when she wasn't of sound mind." She at once reported the occurrence to Mrs. O'Connor's confidential agent and adviser, Mr. Fletcher. Mrs. Momand, next door neighbor and old friend, testified that Mrs. O'Connor was acting irrationally before the final stroke. Two days after the hemorrhage she visited the sick room. In her opinion, at that time, the deceased was of unsound mind. She did not recognize the witness and did not remember the visit of friends who had been with her the night before. The symptoms described by this witness continued until Mrs. O'Connor's death. Reverend Wm. J. Clancy, the assistant pastor of the church in which the deceased had her membership, saw her a number of times before and after the stroke. He anointed her according to the rites of the church, in preparation for death, a ceremony which the decedent did not, in his opinion, appreciate. Before the hemorrhage, according to Father Clancy, the decedent's memory had almost completely gone and she was not normal mentally. She remained passively in this condition until she died.

There is much more evidence to the same effect. Edward E. Kelly, husband of one of the contestants, an old acquaintance, attended to the payment of Mrs. O'Connor's monthly bills for her for several years prior to her death. He testified that during the latter months of her life her mind was failing. About two weeks before the stroke he found her on the street in a dazed condition and unable to recognize him or to appreciate what he said to her. He found her in a stupor on the morning of the stroke and visited her some fifteen times before she died. In his opinion she was

"out of her mind" during the time. Elizabeth Holohan, George W. Holohan, Stasia Speckens, Louise Schroeder, and Carrie Burke testified, the effect of their evidence being that before the stroke Mrs. O'Connor's mind was failing and she was at times irrational, a condition which was aggravated by and gradually grew worse after that occurrence.

The contestants who testified in their own behalf were: James B. Holohan, who seems to have stood in almost the relationship of a son to Mrs. O'Connor, and who was one of the principal legatees under the will of 1915, but who was omitted entirely from the 1919 instrument; H. S. Fletcher, for many years the confidential business agent of Mrs. O'Connor; Alice Holohan Kelly, Frances Zills, and Gertrude Zills, all close and intimate friends of Mrs. O'Connor, and for whom she entertained the warmest personal regard. All of these witnesses testified to facts tending to show that Mrs. O'Connor was irrational, and of lapsing memory prior to the stroke, and of unsound mind thereafter. In their opinion, after April 21, 1919, her mental condition was such that she was incapable of doing any business.

The force and effect of the foregoing testimony is assailed by the appellants. They depend upon an analysis of portions of the evidence favorable to themselves, and the assertion that upon cross-examination statements were elicited from some of the witnesses at variance with their more direct testimony. But the fact remains that the witnesses testified as we have briefly narrated. On the other hand, there is evidence on the part of the proponents, the effect of which is directly to the contrary from that adduced by the contestants. It would serve no useful purpose to present as long a *résumé* of this testimony as we have done in discussing the case of the contestants, for the result would be merely to emphasize the direct conflict, the burden of resolving which in favor of one side or the other rested upon the jury. There is evidence which, if it had been accepted by the jury, will be sufficient to support a verdict upholding the validity of the will. For instance, the attorney who drew the will testified that when he visited Mrs. O'Connor on the morning of April 21st, she was weaker than normal and spoke in a rather low voice, but expressed herself plainly on what she wanted. She gave him instructions relative to making a will, which he jotted down and took

to his office, where he prepared the document in question. He then took it back to Mrs. O'Connor's home, where she signed it in the presence of himself, Dr. Koepke, and Mr. Kilburn. She was, in his judgment, at that time of sound mind. When Miss Helen Phelan, an old friend of Mrs. O'Connor, called on the 7th or 8th of May, she had a conversation with the deceased, at which time she appeared rational. Reverend Florian Zettel, the Catholic priest who received one thousand dollars under the will of April 25th, Caroline McAdam, Maud McAdam, each a legatee under the will, and Ida McAdam testified to conversations and actions of the decedent, before and after the final stroke, to show her competency. The weight to be given their testimony, and whether or not its effect had been destroyed on cross-examination, or overcome by the evidence on the other side, were all matters for the jury, as in the case of the witnesses for the contestants. The testimony of Dr. Koepke and Mr. Kilburn, the other subscribing witness to the will, has already been alluded to. The effect of the direct examination of Mrs. West and Mrs. Gay, nurses who cared for Mrs. O'Connor after April 21st, to the effect that the deceased at times possessed sufficient mentality to execute a will, was somewhat destroyed by the evidence of Laura Falkenberg, another nurse, who was also a witness for the proponents. She testified that during the time she was with the patient she was "absolutely without mentality."

[1] From the foregoing it is at once apparent that the jury reached its verdict that, at the time of the execution of the ·purported will, on April 25, 1919, Mrs. O'Connor was of unsound mind, on sharply conflicting testimony. In the absence of substantial error or law occurring at the trial, and none is claimed here. by the appellants, a judgment based upon such a verdict will not be reversed. (*Estate of Ross*, 179 Cal. 629, 632, [178 Pac. 510].) Appellants attempted to discredit the evidence of Dr. Koepke, who testified that when Mrs. O'Connor signed the purported will, on April 25th, she was not mentally able to comprehend or understand its contents, and thus claim that Mr. Wyckoff's positive testimony, and the less satisfactory evidence of Mr. Kilburn, stand uncontradicted. But the jury, apparently, did not think Dr. Koepke discredited or his testimony unworthy of credence. Even had it done so, we

would still be unable to set aside their verdict on the grounds advanced by appellants. [2] Much evidence was admitted on both sides to show the condition of Mrs. O'Connor's mind before and after the date of her testamentary act. Such evidence was relevant and important for its bearing upon the condition of her mind when the will was executed. (*Estate of Wilson*, 117 Cal. 262, 276, [49 Pac. 172, 711]; *Estate of Purcell*, 164 Cal. 300, [128 Pac. 932].) This evidence was entitled to such weight and consideration as the jury thought it deserved. (*Dunphy* v. *Dunphy*, 161 Cal. 380-385, [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512].) It tended, on the part of the contestants, to show that Mrs. O'Connor was afflicted with a gradually increasing unsoundness of mind, which became complete after the cerebral stroke, and which was always manifest and ever present, affecting her mental capacity, particularly in the months preceding and during her last illness, when she made the questioned will. Other evidence, mostly that in behalf of the proponents, tended to show that her incompetency was of a form that manifested itself by frequent attacks, with lucid intervals in between. With the testimony of Dr. Koepke disposed of, as appellants would have us hold, they insist that the only evidence relating to Mrs. O'Connor's condition when she was actually signing her will was to the effect that she was then in a lucid interval. But from this entire evidence the jury could have concluded either that Mrs. O'Connor had no testamentary capacity during her last illness, or that the will was not executed during a lucid interval of her mind. In this condition of the case upon the testimony the decision of the jury cannot be disturbed upon the ground that it is contrary to the evidence. (*Estate of Jones*, 166 Cal. 108-110, [135 Pac. 288]; *Estate of Martin*, 170 Cal. 657-663, [151 Pac. 138].)

The judgment is affirmed.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 7, 1921.

All the Justices concurred, except Sloane, J., who was absent.

[Civ. No. 2181.   Third Appellate District.—February 10, 1921.]

# LUKE SANGUINETTI, Respondent, v. MARTHA E. SANGUINETTI, Appellant.

[1] Husband and Wife—Contract—Relinquishment of Interest of Wife in Property—Continuance of Relationship—Homestead. In view of the provisions of sections 158 and 159 of the Civil Code, a husband or wife without entering into an agreement in writing for an immediate separation may convey to the other all title and interest in the community property or the separate property of the other, and where a wife for a valuable consideration, and in the absence of any unfair advantage taken by the husband, waives and relinquishes to him all of her interest in the community property and in his separate property, she cannot thereafter declare a homestead on any of the property, although they continue to live together as husband and wife.

APPEAL from a judgment of the Superior Court of Calaveras County.   J. A. Smith, Judge.   Affirmed.

The facts are stated in the opinion of the court.

J. B. Curtin for Appellant.

Snyder & Snyder for Respondent.

BURNETT, J.—The action was brought to have it decreed that plaintiff is the owner of a certain described tract of land; that defendant has no right, title, or estate therein; that a certain declaration of homestead placed thereon by defendant is void, and that the same be canceled and annulled.   Relief was granted as prayed for, and defendant has appealed from the judgment.

The basis of the action is found in this written agreement executed by the parties on June 6, 1916:

fornia, to this date, but their matrimonial relations have not been pleasant or agreeable and either is entitled to a divorce from the other and for the purpose of settling and adjusting their property rights, this agreement is made as follows:

