MARGARETHA CATHERINE OHLE GOOS, APPELLANT, v. KARL BROCKS ET AL., APPELLANTS: MATHEW A. SCHOLL ET AL., APPELLEES.

FILED JANUARY 10, 1929. No. 26730.

*Tibbets, Lambe & Hewitt* and *Detjen & Detjen,* for appellants.

*O. S. Spillman,* Attorney General, *Paul E. Boslaugh, E. P. Nuss* and *Pierce & Simmons, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

GOOD, J.

This appeal arises out of an action to partition lands in Adams county and involves the right of nonresident aliens to inherit land in the state of Nebraska. The parties to the original action claim to be the owners of the land as next of kin and heirs at law of Fred Ohle, who died, intestate, October 23, 1917, seised of the lands in controversy, and leaving him surviving no widow, issue or parent. In the partition action there was an order confirming the shares of the parties, ordering partition, the appointment of a referee, and, upon his report, a sale ordered and had. The purchasers paid one-fourth of the purchase price at the time of the bid. The parties moved for a confirmation of the sale and for a distribution of the proceeds. Thereupon, the purchasers filed a petition in which they asked that the sale be vacated and that they be released from their bid and for a refund of the money paid by them. The ground on which the purchasers sought to vacate the sale and be released from their bid was that the parties to the action were nonresident aliens and were incapable of inheriting the lands in question; that, therefore, they had no title and no title could be given the purchasers.

The trial court found and determined that the parties to the action were nonresident aliens and were incapable of inheriting the lands from Ohle, and vacated the sale and released the purchasers from their bid. All of the parties to the original partition proceeding have appealed. After the appeal was lodged in this court, the state of Nebraska, having first obtained leave, intervened and claims title to the real estate by escheat, upon the ground that Ohle left no kindred capable of inheriting. The facts are not in dispute. The original parties to the action were, at the time of the death of Mr. Ohle, nonresident aliens and citizens of the then empire of Germany. At the time of Ohle's death a state of war existed between the United States and the German Empire.

At common law nonresident aliens were incapable of inheriting land. At the time Mr. Ohle died, section 6273, Rev. St. 1913, was in force. That section provides: "Nonresident aliens * * * are hereby prohibited from acquiring title to or taking or holding any lands or real estate in this state by descent, devise, purchase or otherwise, only as hereinafter provided."

It will thus be seen that under the common law and statutes nonresident aliens were incapable of inheriting, unless such right was secured to them by a superior power. The Constitution of the United States makes treaties, entered into between the United States and other nations, the supreme law of the land, and such treaties, when made and ratified, will override or render nugatory for the time being any statute of a state to the contrary on matters which may be lawfully the subject of a treaty. That the right of nonresident aliens to inherit lands may be conferred by treaty has been recognized for many years.

In the instant case, the purchasers at the partition sale and the intervener contend that the declaration of war, on the part of the United States, against Germany, occurring April 6, 1917, operated to abrogate any treaty rights of the subjects of Germany being nonresidents, to inherit

lands in the United States, and the intervener further contends that the treaties which existed at the time war was declared did not extend to or cover the right of a subject of Germany to inherit lands from a citizen of the United States. On the other hand, the appellants contend that the existing treaties between the United States and provinces which formed a part of the German Empire were sufficient to guarantee to them the right to inherit from a citizen of the United States, and also that the treaty provisions, respecting the right to inherit, were not abrogated by the fact that a state of war existed between the United States and the German Empire.

The treaty provisions on which the appellants rely are set out as follows: Article XIV of the treaty with Prussia, concluded in May, 1828, and promulgated March 14, 1829, among other things, provides: "The citizens or subjects of each party shall have power to dispose of their personal goods within the jurisdiction of the other, by testament. * * * And where, on the death of any person holding real estate within the territories of the one party, such real estate would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by alienage, such citizen or subject shall be allowed a reasonable time to sell the same, and to withdraw the proceeds without molestation, and exempt from all duties of detraction, on the part of the government of the respective States." Treaties and Conventions, vol. II, p. 1500.

Article VII of the treaty with Hamburg, concluded December 20, 1827, and promulgated January 2, 1828, among other things, provides: "The citizens of each of the contracting parties shall have power to dispose of their personal goods, within the jurisdiction of the other, by sale, * * * and if, in the case of real estate, the said heirs would be prevented from entering into the possession of the inheritance on account of their character of aliens, there shall be granted to them the term of three years to dispose of the same, as they may think proper, and to withdraw the proceeds without molestation, and exempt from all

duties of detraction on the part of the government of the respective States." Treaties and Conventions, vol. I, p. 903.

Article X of the treaty with the German Empire, concluded December 11, 1871, and promulgated June 1, 1872, among other things, provides: "In case of the death of any citizen of Germany in the United States, or of any citizen of the United States in the German Empire, without having in the country of his decease any known heirs or testamentary executors by him appointed, the competent local authorities shall at once inform the nearest consular office of the nation to which the deceased belongs of the circumstance, in order that the necessary information may be immediately forwarded to parties interested. * * * In all successions to inheritances, citizens of each of the contracting parties shall pay in the country of the other such duties only as they would be liable to pay, if they were citizens of the country in which the property is situated or the judicial administration of the same may be exercised." Treaties and Conventions, vol. I, p. 553.

The intervener contends that the provisions of the treaties above set out were not intended to control the devolution of title to real estate from a citizen of the country in which it is situated, but only to control the right to inherit real estate from an alien owner residing in the country where the real estate is situated, and cites as supporting this view Petersen v. Iowa, 245 U. S. 170, 62 L. ed. 225; Duus v. Brown, 245 U. S. 176, 62 L. ed. 228; Frederickson v. Louisiana, 23 How. (U. S.) 445, 16 L. ed. 577; and other cases from state jurisdictions. An examination of all of these cases discloses that the opinions deal with the right of the state to impose succession or death taxes, and not to the right of aliens to inherit from citizens of this country. The authorities cited, therefore, are not in point on the question presented by the record in this case.

Accepted principles require a liberal rather than a narrow interpretation of the terms of treaties. Jordan v. Tashiro, 49 Sup. Ct. Rep. 47. Applying this principle of

interpretation, we think the treaty provisions above quoted clearly provide for, and guarantee to the subjects of the provinces of the German Empire, with which the treaties were concluded, the right to inherit real estate from a citizen of the United States, where such right would be conferred by state statute but for his alienage.

The principal question for determination is: Were the treaty provisions, relied upon by the next of kin of Fred Ohle, in force at the time of his death; or were they abrogated because of the then-existing state of war between this country and the German Empire?

Intervener and appellees invoke the rule announced in *Sullivan v. Kidd,* 254 U. S. 433, 65 L. ed. 344, namely: That the construction placed upon a treaty by the executive department of the federal government charged with the supervision of our foreign relations should be given much weight, and, as a basis for its application, cite the following letter:

"Department of State, Washington, March 21, 1923.
"Sir:

"The department has received your letter of March 10, 1923, requesting to be informed concerning the treaty of 1928 between the United States and Prussia.

"In reply, you are advised that this treaty is regarded as having been in force at the time of the declaration of the state of war between the United States and Germany.

"By the treaty concluded between the United States and Germany on August 25, 1921, to restore friendly relations between the two nations, Germany accords to the United States rights and advantages stipulated for its benefit under the treaty of Versailles, which has not been ratified by this government. Under article 289 of that treaty bilateral treaties with Germany concluded with each of the allied and associated powers are in effect declared abrogated and the right is accorded to each allied or associated power to revive by giving notice to Germany within a specified period any treaty or convention which it may

be desired to continue in effect. This government did not give notice within the period referred to in article 289 as extended by paragraph 5 of article 2 of the treaty between the United States and Germany of August, last, of its intention to revive the treaty of 1828 between the United States and Prussia and this treaty, therefore, is not regarded by the department as now being in force."

From this letter it will be observed that there is nothing to indicate that the federal department of state was holding that the treaty with Prussia was not in force in October, 1917, or that it was abrogated by the declaration of war between the United States and Germany. The inference is plain that the abrogation of the treaty was effected by the treaty of peace concluded between this country and Germany in August, 1921, and which adopted the provisions of the treaty of Versailles with certain exceptions. This treaty of peace was concluded long after the death of Ohle.

It is a well-established rule that wherever the rights of individuals have vested under provisions of a treaty they will not be affected by its subsequent suspension or abrogation. *Society for Propagation of the Gospel v. New Haven*, 8 Wheat. (U. S.) *464, 5 L. ed. 662. There is, therefore, no occasion for application of the rule announced in *Sullivan v. Kidd, supra.*

This brings us to the real problem presented by this appeal, viz.: Did the declaration of war against the German Empire operate to suspend or annul the provisions of the treaties with the German states hereinbefore quoted and which secure to the citizens of the German states the right to inherit real estate in this country? That a state of war between the contracting powers to treaties will operate to terminate some and not affect other treaty provisions is now generally recognized by practically all modern authorities. Treaty provisions for friendly commercial relations, for alliances, and, generally, of a political nature, are necessarily suspended or abrogated by a state of war between the contracting powers. Those treaty provisions

which fix national boundaries and which cede territory from one nation to another nation and which from their nature are intended to be permanent will remain in force unaffected by a state of war between the parties to such treaties.

After a careful examination of all the authorities cited in the able briefs of counsel and from a somewhat extended independent research of the authorities pertaining to the subject, we find the clearest and most comprehensive statement of the law in the opinion in *Techt v. Hughes*, 229 N. Y. 222, 11 A. L. R. 166, by that eminent jurist, Judge Cardozo. In the opinion in that case the authorities are extensively reviewed. The situation concerning the confused state of the authorities is set forth in the following apt language in the opinion:

"The effect of war upon the existing treaties of belligerents is one of the unsettled problems of the law. The older writers sometimes said that treaties ended *ipso facto* when war came. 3 Phillimore, International Law, 794. The writers of our own time reject these sweeping statements. 2 Oppenheim, International Law, sec. 99; Hall, International Law, 398, 401; Fiore, International Law (Borchard's Translations) sec. 845. International law today does not preserve treaties or annul them regardless of the effects produced. It deals with such problems pragmatically, preserving or annulling as the necessities of war exact. It establishes standards, but it does not fetter itself with rules. When it attempts to do more, it finds that there is neither unanimity of opinion nor uniformity of practice. 'The whole question remains as yet unsettled.' Oppenheim, *supra*. This does not mean, of course, that there are not some classes of treaties about which there is general agreement. Treaties of alliance fall. Treaties of boundary or cession, 'dispositive' or 'transitory' conventions, survive. Hall, International Law, 398, 401; 2 Westlake, International Law, 34; Oppenheim, *supra*. So, of course, do treaties which regulate the conduct of hostilities. Hall, *supra;* 5 Moore, International

Law Dig. 372; *Society for Propagation of the Gospel v. New Haven,* 8 Wheat. *464, *494; 5 L. ed. 662, 669.

"Intention in such circumstances is clear. These instances do not represent distinct and final principles. They are illustrations of the same principle. They are applications of a standard. · When I ask what that principle or standard is, and endeavor to extract it from the long chapters in the books, I get this, and nothing more: That provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected.

"Treaties lose their efficacy in war only if their execution is incompatible with war. * * * Bluntschli, Droit International Codifié, sec. 538.

"That in substance was Kent's view, here as often in advance of the thought of his day: 'All those duties of which the exercise is not necessarily suspended by the war subsist in their full force. The obligation of keeping faith is so far from ceasing in time of war that its efficacy becomes increased, from the increased necessity of it.' "

The following language from the opinion in *Techt v. Hughes, supra,* "That (treaty) provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected," we regard as stating a principle founded on logic and sound reason. It follows that the treaty provision involved in this action may not be disregarded unless required by the necessities of war. The right of alien enemies to inherit cannot affect the fortunes of war existing between the parties to the treaty unless the inheritance may be sold and the proceeds placed in the possession of the enemy during the progress of hostilities. It is at all times within the power of the government of this country to prohibit the withdrawal of such funds by citizens of a nation with which we are at war. This power has been exercised in the passage of the act providing for the appointment of a custodian of alien enemy property who by national legislation is authorized to seize and hold during the war all property

situated in this country and owned by alien enemies. Moreover, the federal government is vested with power to confiscate the property of alien enemies which may come into its possession. This nation has not found it necessary to resort to such drastic measures. It has adopted the more humane policy of restoring to the citizens of Germany their property which has been seized by the alien property custodian.

We therefore hold that the right to inherit lands conferred by the treaties involved is a provision that is compatible with, and is not abrogated by, a state of war between this country and the German empire.

A like question was presented to the supreme court of Kansas in the case of *State v. Reardon*, 120 Kan. 614, which involved one of the same treaties that is here in question. That court followed the rule laid down in *Techt v. Hughes, supra,* and held that citizens of the German empire were entitled to inherit from a citizen of the state of Kansas. We conclude that the next of kin of Fred Ohle, deceased, who resided within the German empire at the time of his decease, were entitled to and did inherit the lands in this action.

It follows that the judgment of the district court should be and is reversed, and the cause remanded, with directions to enter judgment in conformity with this opinion.

REVERSED.