[Civ. No. 18296. Second Dist., Div. Three. Dec. 3, 1951.]

Estate of BERTHA FRANCISCO KLAMP MEYER, Deceased. IRMA MARTIN et al., Appellants, v. J. HOWARD McGRATH, as Attorney General of United States, Respondent.

John Moore Robinson and Robert Morgan Himrod for Appellants.

Harold I. Baynton, Assistant Attorney General of the United States, Director, Office of Alien Property; Ernest A. Tolin, United States Attorney, Clyde C. Downing, Assistant United States Attorney, Valentine Hammack, Special Assistant to the Attorney General of the United States, James D. Hill, George B. Searls, Joseph Laufer, Attorneys, Department of Justice, for Respondent.

VALLÉE, J.—Appeal by Irma Martin and Rolf Jansen, distributees of a portion of the above entitled estate, from

that part of a decree of final distribution which distributed to respondent Attorney General of the United States two-thirds of the estate which descended to nonresident alien heirs.

Bertha Meyer, a national and resident of Germany, died intestate in Bremen, Germany, on August 2, 1924. Her heirs were a daughter, Emilie Bredehorst, and three grandchildren, Irma Martin and Hans and Rolf Jansen, children of a predeceased daughter, all of whom were residents and nationals of Bremen, Germany, at the time of her death. Rolf Jansen entered the United States in June, 1929, and became a citizen in 1941. Irma Martin entered the United States in 1939, and became a citizen in 1945. Emilie Bredehorst and Hans Jansen remained in, and at all times have been nationals and residents of, Bremen. Decedent left personal property in California, consisting of 300 shares of the stock of Honolulu Oil Corporation and cash representing dividends which had accumulated since 1941, when they were frozen by Executive Order No. 8785,[1] issued June 14, 1941, which extended freezing controls initiated by Executive Order No. 8389,[2] issued April 10, 1940, by the President, pursuant to the powers vested in him by section 5(b) of the Trading with the Enemy Act,[3] to assets of German nationals.

Decedent's estate in California was not administered until October 22, 1948, when Irma Martin was appointed administratrix. On November 17, 1949, Irma Martin filed with the probate court two identical instruments executed in Bremen, Germany, on August 22, 1949, by Emilie Bredehorst and Hans Jansen, entitled ''Waiver of Interest,'' by which they waived ''all right to participate in the distribution'' of the estate in California.

On January 20, 1950, respondent attorney general, as successor to the alien property custodian,[4] vested in himself all the right, title, interest, and claim of any kind of Emilie Bredehorst and Hans Jansen in the estate by virtue of vesting order No. 14276.

On December 1, 1950, Irma Martin filed her final account, report, and petition for final distribution, alleging that Emilie

[1] 6 Fed. Reg. 2897.

[2] 5 Fed. Reg. 1400.

[3] 40 Stats. 411, 415, ch. 106, Oct. 6, 1917, as amended by Joint Resolution of May 7, 1940, 54 Stats. 179, ch. 185, and First War Powers Act of Dec. 18, 1941, § 301, 55 Stats. 838, 839, ch. 593, 50 U.S.C. App. § 5.

[4] Executive Order No. 9788, 11 Fed. Reg. 11981.

Bredehorst and Hans Jansen had waived "all claim, right, title or interest" in the estate, that she, Irma Martin and Rolf Jansen were decedent's sole heirs, and prayed that the estate be distributed to them, share and share alike.

Objections to the petition were filed by respondent attorney general, in which it was alleged that Emilie Bredehorst and Hans Jansen were residents and nationals of Germany when decedent died on August 2, 1924, and "aliens not residing within the United States or its territories"; that the waivers executed by the German nationals were "in contravention of the provisions of the Trading with the Enemy Act, as amended, and Executive Order 8389, as amended (6 F.R. 2897) and the Rules and regulations issued thereunder," and were null and void and of no effect; and prayed that all the right, title, interest, and claim of the two German nationals be distributed to him, as successor to the alien property custodian.

The court made an order by which it found, among other matters, that Emilie Bredehorst was entitled to succeed to one-half of the estate, that Hans Jansen, Rolf Jansen and Irma Martin were each entitled to succeed to one-sixth thereof, and that respondent attorney general was entitled to receive distribution of the interests of Emilie Bredehorst and Hans Jansen by virtue of the vesting order.

█ Statutes governing the right of inheritance in force at the time of death control the disposition of property left by an intestate.[5] Under the statute in force on August 2, 1924, Emilie Bredehorst, as surviving daughter, succeeded to one-half of the estate, and Irma Martin and Hans and Rolf Jansen, children of a predeceased daughter, each succeeded to one-sixth of the estate. (Civ. Code, § 1386, subd. 1; now Prob. Code, § 222.) However, since these heirs were nonresident aliens at the time of decedent's death, they were required, under sections 672[6] and 1404[7] of the Civil Code, then in force,

[5] Probate Code, §§ 259-259.2, were enacted in 1941 (Stats. 1941, p. 2473), and are therefore not applicable. They cannot be applied retroactively. *Estate of Giordano*, 85 Cal.App.2d 588, 594 [193 P.2d 771]; *In re Nossen's Estate*, 118 Mont. 40 [162 P.2d 216].

[6] "If a non-resident alien takes by succession, he must appear and claim the property within five years from the time of succession, or be barred. The property in such case is disposed of as provided in title eight, part three, Code of Civil Procedure."

[7] "Resident aliens may take in all cases by succession as citizens; and no person capable of succeeding under the provisions of this title is precluded from such succession by reason of the alienage of any relative; but no nonresident foreigner can take by succession unless he appears and claims such succession within five years after the death of the decedent to whom he claims succession."

to appear and claim their succession within five years after decedent's death, or be barred from taking.

Appellants' position is that the nonresident heirs were barred from succeeding to the estate by virtue of former Civil Code sections 672 and 1404, that the entry of Rolf Jansen into the United States in 1929 "prevented the State of California from proceeding to declare an escheat of the estate," and that since no escheat proceedings were commenced by the state, appellants became entitled to the whole thereof.

Respondent contends that the Civil Code sections were suspended and controlled by the treaty of 1828 with Prussia.[8] Appellants say that the treaty was abrogated by World War I, was no longer in effect in 1924, and that the treaty with Germany of December 8, 1923,[9] was inapplicable, as it was not proclaimed until October 14, 1925, after decedent's death.

The treaty of 1828 with Prussia was not controlling. Bertha Meyer died a citizen of Bremen in 1924. Bremen was not a part of Prussia in 1828 or in 1924.[10] The controlling treaty was the treaty between the United States and the Free Hanseatic Republics of Lubeck, Bremen, and Hamburg, signed December 20, 1827.[11] Article VII of the Bremen treaty[12] clearly governs the right of succession to real and personal property, and protects the right of citizens of each

[8] 8 Stats. 378-386.

[9] 44 Stats. 2132.

[10] In 1646 Emperor Frederick III created Bremen a free imperial city. (See "Bremen," 4 Ency. Brit. 89; "Hanseatic League," 11 Ency. Brit. 162.) Bremen was a free German state. (10 Ency. Brit. 280.) In 1866 it became a part of the North German Union (id. 290) and in 1871 a part of the German Empire. (Id. 293.)

[11] 8 Stats. 366; 18 Stats. part 2, page 400. The cause is argued by both sides on the assumption that the treaty of 1828 with Prussia was controlling. However, as the pertinent provisions of the treaty of 1827 with Bremen are substantially identical with the provisions of the treaty of 1828 with Prussia, the argument is relevant. 8 Stats. 384, art. XIV.
The government of the United States has recognized the treaty of 1827 with Bremen as applicable to Germany after the formation of the North German Union in 1866 and the German Empire in 1871, and accorded reciprocity accordingly. *North German Lloyd S. S. Co.* v. *Hedden*, 43 F. 17, 19; *Terlinden* v. *Ames*, 184 U.S. 270 [22 S.Ct. 484, 46 L.Ed. 534, 542-545]. See, also, *Flensburger Dampfercompagnie* v. *United States*, 59 F.2d 464, 467, and authorities there cited.

[12] "The citizens of each of the contracting parties shall have power to dispose of their personal goods, within the jurisdiction of the other, by sale, donation, testament, or otherwise; and their representatives, being citizens of the other party, shall succeed to their said personal goods, whether by testament or *ab intestato*, and they may take possession thereof, either by themselves or others acting for them, and dispose of the same at their will, paying such dues only as the inhabitants of the country wherein said goods are, shall be subject to pay in like

of the contracting parties reciprocally to own, dispose of, and transmit personal property situated in the other country, free from provisions or restrictions which discriminate because of alienage. No limitation is placed on the right of citizens of Bremen.

The provisions of the treaty of 1827 with Bremen, if in force in 1924, were the supreme law of the land and superseded all local laws inconsistent with its terms. To the extent that our statutes conflicted with the treaty, the former were superseded by the latter, which must control.[13]

Under our laws in force in 1924, the date of death of decedent, the property of a person who died intestate vested in his heirs immediately upon the death of the ancestor. If the heirs were citizens of the United States, they became vested immediately with the entire estate of the ancestor by a title which was indefeasible except for the purposes of administration in the manner and for the purposes provided by law; but if such heirs were nonresident aliens, the estate which vested in them upon the death of the ancestor was not an absolute or indefeasible estate, but was a conditional estate, upon the condition subsequent that if they failed to appear and claim the same within five years, their right ceased. The nonresident alien, under our law unaffected by a treaty, did not enjoy the same right to succeed to personal property as citizens of the United States.[14] The nonresident alien heirs of Bertha Meyer did not appear and claim their succession within five years after her death. Therefore, unless their right to succeed was affected by a treaty, they were barred from taking under our law as it existed in 1924.

The effect of war upon existing treaties of belligerents has been the subject of much discussion. ■ The old doctrine, sometimes asserted by the older writers, that war *ipso facto* annuls treaties of every kind between the warring nations, is repudiated by the great weight of modern authority; and

cases; and if, in the case of real estate, the said heirs would be prevented from entering into the possession of the inheritance on account of their character of aliens, there shall be granted to them the term of three years to dispose of the same, as they may think proper, and to withdraw the proceeds without molestation, and exempt from all duties of detraction on the part of the government of the respective States." 8 Stats. 370.

[13]*Estate of Turner*, 51 Cal.App. 317, 322-323 [196 P. 807]; *Blythe* v. *Hinckley*, 127 Cal. 431, 436 [59 P. 789]; *Estate of Romaris*, 191 Cal. 740 [218 P. 421]; *Estate of Knutzen*, 31 Cal.2d 573, 577 [191 P.2d 747]; *Clark* v. *Allen*, 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 1641, 170 A.L.R. 953]; 52 Am.Jur. 816, § 18.

[14]*Estate of Romaris*, 191 Cal. 740, 744 [218 P. 421].

the view now commonly accepted is that whether the stipulations of a treaty are annulled by war depends upon their intrinsic character.[15] ▮ The authorities appear to be in accord that there is nothing incompatible with the policy of the government, with the safety of the nation, or with the maintenance of war in the enforcement of dispositive treaties or dispositive parts of treaties. Such provisions are compatible with, and are not abrogated by, a state of war.[16]

▮ We therefore hold that the rights of Emilie Bredehorst and Hans Jansen to inherit from Bertha Meyer, under the treaty with Bremen, were not cut off by the declaration of war between the United States and Germany. There remains

---

[15]*Clark* v. *Allen,* 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 1641, 170 A.L.R. 953]; *Society for Propagation of the Gospel* v. *New Haven,* 8 Wheat. (U.S.) 464 [5 L.Ed. 662, 669]; *Karnuth* v. *United States,* 279 U.S. 231 [49 S.Ct. 274, 73 L.Ed. 677]; *Techt* v. *Hughes,* 229 N.Y. 222 [128 N.E. 185, 11 A.L.R. 166], cert. den. 254 U.S. 643 [41 S.Ct. 14, 65 L.Ed. 454]; *State [ex rel. Miner]* v. *Reardon,* 120 Kan. 614 [245 P. 158, 47 A.L.R. 452]; *Goos* v. *Brocks,* 117 Neb. 750 [223 N.W. 13]; *The Sophie Rickmers* (S.D.N.Y.), 45 F.2d 413, 418-21; *Sutton* v. *Sutton,* 39 Eng.Rep. 255; 5 Moore's Digest of International Law, 383, § 779.

[16]*Clark* v. *Allen,* 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 1641, 170 A.L.R. 953]; *Techt* v. *Hughes,* 229 N.Y. 222 [128 N.E. 185, 11 A.L.R. 166], cert. den. 254 U.S. 643 [41 S.Ct. 14, 65 L.Ed. 454]; State *[ex rel. Miner]* v. *Reardon,* 120 Kan. 614 [245 P. 158, 47 A.L.R. 452]; *Goos* v. *Brocks,* 117 Neb. 750 [223 N.W. 13]; *The Sophie Rickmers* (S.D.N.Y.), 45 F.2d 413, 418-21; 52 Am.Jur. 813, § 15; Anno.: 11 A.L.R. 180; V Hackworth, Digest of International Law, 377-390 (a publication of the Department of State).

In upholding the right of an Austro-Hungarian national, resident in the United States, to inherit land in New York after the outbreak of war between the United States and Austria-Hungary under the treaty of commerce and navigation with Austria of 1829, as extended by the convention of 1848, the Court of Appeals of New York in *Techt* v. *Hughes, supra,* speaking through Judge Cardoza, said, p. 191 (128 N.E.): ''The effect of war upon the existing treaties of belligerents is one of the unsettled problems of the law. The older writers sometimes said that treaties ended ipso facto when war came (3 Phillimore Int. L. 794). The writers of our own time reject these sweeping statements (2 Oppenheim Int. L. § 99; Hall, Int. L. 398, 401; Fiore, Int. L. [Borchard's Transl.] § 845). International law to-day does not preserve treaties or annul them regardless of the effects produced. It deals with such problems pragmatically, preserving or annulling as the necessities of war exact. It establishes standards, but it does not fetter itself with rules. When it attempts to do more, it finds that there is neither unanimity of opinion nor uniformity of practice. 'The whole question remains as yet unsettled' (Oppenheim, *supra*). This does not mean, of course, that there are not some classes of treaties about which there is general agreement. Treaties of alliance fall. Treaties of boundary or cession, 'dispositive' or 'transitory' conventions, survive (Hall, Int. L. pp. 398, 401; 2 Westlake, Int. L. 34; Oppenheim, *supra*). So, of course, do treaties which regulate the conduct of hostilities (Hall, *supra*; 5 Moore Dig. Int. L. 372; *Society for Propagation of the Gospel* v. *Town of New Haven,* 8 Wheat. [U.S.] 464, 494 [5 L.Ed. 662].) Intention in such circumstances is clear. These instances do not represent

the question whether the right of citizens of Bremen to inherit was affected by what occurred after the war of 1917-18.

The treaty of peace between the United States and Germany, proclaimed November 14, 1921, referring to the Treaty of Versailles, provided: "(1) That the rights and advantages stipulated in that Treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in . . . Parts . . . X . . . " (42 Stats. 1939.)

distinct and final principles. They are illustrations of the same principle. They are applications of a standard. When I ask what that principle or standard is, and endeavor to extract it from the long chapters in the books, I get this, and nothing more: That provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected. . . . . I find nothing incompatible with the policy of the government, with the safety of the nation, or with the maintenance of the war in the enforcement of this treaty, so as to sustain the plaintiff's title.''

In *State [ex rel. Miner]* v. *Reardon, supra,* 120 Kan. 614 [245 P. 158, 47 A.L.R. 452], a citizen of the United States died intestate October 15, 1924, owning real property and leaving nonresident alien heirs, citizens of Germany, residing in Prussia. The state brought action against the nonresident alien heirs, asking to be adjudged the owner of the land on the ground that the aliens were incapable of inheriting, there being no statute qualifying them. The state contended that the treaty of 1828 with Prussia ceased to be effective by reason of the war between the United States and Germany. The court said, p. 159: ''Upon the grounds indicated in the opinion in the Techt-Hughes Case we regard the reciprocal privilege of inheritance as not so related to the carrying on of a war as to create a presumption of an intention it should operate only in time of peace. Practically the only important question is which way the presumption lies, for, of course, either belligerent by affirmative action may use its own pleasure as to suffering the pre-war condition to continue.''

In a like holding considering the provisions of treaties with the several German states which secured to citizens of the German states the right to inherit real estate in the United States, the Supreme Court of Nebraska in *Goos* v. *Brocks, supra,* 117 Neb. 750 [223 N.W. 13], said p. 16 (223 N.W.): ''[T]he treaty provision involved in this action may not be disregarded unless required by the necessities of war. The right of alien enemies to inherit cannot affect the fortunes of war existing between the parties to the treaty unless the inheritance may be sold and the proceeds placed in the possession of the enemy during the progress of hostilities. It is at all times within the power of the government of this country to prohibit the withdrawal of such funds by citizens of a nation with which we are at war. This power has been exercised in the passage of the act providing for the appointment of a custodian of alien enemy property who by national legislation is authorized to seize and hold during the war all property situated in this country and owned by alien enemies. . . . We therefore hold that the right to inherit lands conferred by the treaties involved is a provision that is compatible with, and is not abrogated by, a state of war between this country and the German Empire.''

Article XXIV of the treaty of 1799 between the United States and Prussia, dealing with treatment of prisoners of war, which was revived by the treaty of 1828, was regarded as in effect after the outbreak of war between the United States and Germany in 1917. (The Secretary of State (Lansing) to the Secretary of War (Baker), Apr. 17, 1918,

Other pertinent clauses are set forth in the margin.[17] The Treaty of Versailles stipulated in Article 289 of Part X: "Each of the Allied or Associated Powers, being guided by the general principles or special provisions of the present Treaty, shall notify to Germany the bilateral treaties or conventions which such Allied or Associated Power wishes to revive with Germany. . . . A period of six months from the coming into force of the present Treaty is allowed to the Allied and Associated Powers within which to make the notification. Only those bilateral treaties and conventions which have been the subject of such a notification shall be revived between the Allied and Associated Powers and Germany; all the others are and shall remain abrogated." (V Hackworth, Digest of International Law, 386, a publication of the Department of State.) The United States did not make the notification with respect to any of the provisions of the treaty with Bremen of 1827.[18] ■ We are of the opinion, in accord with the Supreme Court of Kansas,[19] that Article 289 is to be interpreted

MS. Department of State, file 763.72114/3322. See, also, 1918 For. Rel., Supp. 2, pp. 55, 57, 59, 86, 169.)

[17] "ARTICLE I. Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities, reparations or advantages specified in the aforesaid Joint Resolution of the Congress of the United States of July 2, 1921, including all the rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles which the United States shall fully enjoy notwithstanding the fact that such Treaty has not been ratified by the United States. ARTICLE II. With a view to defining more particularly the obligations of Germany under the foregoing Article with respect to certain provisions in the Treaty of Versailles, it is understood and agreed between the High Contracting Parties: (1) That the rights and advantages stipulated in that Treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in Section 1, of Part IV, and Parts V, VI, VII, IX, X, XI, XII, XIV, and XV. The United States in availing itself of the rights and advantages stipulated in the provisions of that Treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions. . . ." 42 Stats. 1939, 1942.

[18] V Hackworth, Digest of International Law, 387-390 (a publication of the Department of State).

[19] *State* [ex rel. Miner] v. *Reardon, supra*, 120 Kan. 614 [245 P. 158], in which the court, in considering the effect of the first World War on the treaty of 1828 between the United States and Prussia, said, p. 160 (245 P.): "Considered by itself the provision that each of the Allied or Associated Powers shall notify to Germany the treaties which it wishes to revive may readily be interpreted as not applying to any treaty or part of a treaty which was not suspended or annulled by the war, since there is no occasion to revive a treaty or part of one which has remained continuously in force. But the fact of the regulations regarding revival being expressly made applicable to treaties with countries with which Germany had not been at war suggests that the treaties which were no longer in force were not the only ones to be

as not applying to any treaty or part of a treaty which was not abrogated by the war, since there was no occasion to revive a treaty or part of one which had been continuously in force, and that it was not the intention by the clause "all the others are and shall remain abrogated," to absolutely wipe out all

revived. Moreover, the statement as to the effect of nonrevivor is not merely that treaties which have not been the subject of notification shall *remain* abrogated. The language is: 'All the others *are* and shall remain abrogated.' However, the treaty with Germany did not make the terms of article 289 of the Treaty of Versailles binding on the United States. It merely extended to the United States the rights and advantages stipulated in that article for its benefit. By that means this country was given the privilege of reviving any treaties (or parts of treaties) with Germany (or any of the German states) which had been annulled or suspended by the war, but it does not follow that a part of a treaty which remained unimpaired required revival in order to remain in force, even if that was the effect of the Treaty of Versailles as between the parties to it in a like situation. It seems obvious that there was no intention of absolutely wiping out all former treaties between the United States and Germany. There was necessarily an implied exception in favor of those entered into to establish a permanent status, such as one settling a boundary dispute. Nor can it have been intended to divest property rights that had already vested under existing treaties. The question to be determined is whether the same considerations which are held to warrant classifying treaty provisions granting a reciprocal privilege of inheritance with those which are not affected by war may not also warrant classifying them with those that were intended to be nullified by the failure to have them formally revived after the war. To hold in the affirmative requires some extension of the principle, but all the arguments in favor of its application in the one case tend, although with perhaps less force, to justify its application in the other. With respect to old treaties concerning, for instance, commerce, which became inoperative by reason of the war because inconsistent with it, this government may well have thought it better there should be no revival, leaving the matters affected to be adjusted by subsequent negotiations. But it is difficult to believe there was a purpose to withdraw the privilege of individuals to inherit, which is not incompatible with hostilities, and which the war itself had not disturbed. We hold that the provision of the treaty with Prussia, so far as it related to this subject, remained in force until it was replaced by a like provision of the treaty with Germany, signed December 8, 1923, and proclaimed October 14, 1925. The defendants suggest that the League of Nations clause of article 289 of the Treaty of Versailles, making the League the arbitrator of any difference of opinion in connection with the revival of treaties, prevents the application of any part of that article, because of the provision of the treaty of August 25, 1921 (article·2, subd. 2 [42 Stats. 1943]), that the United States shall not be bound by any part of the Versailles Treaty, relating to the League of Nations, nor by any action of the League, unless expressly assented to. Possibly the ratification of the treaty containing the provision last referred to may imply an acceptance by this country of the services of the League to the extent indicated in article 289 of the Versailles Treaty. If not, we see no difficulty in rejecting the clause of that article relating to the League of Nations while giving effect to the rest of it.''

In *Hempel* v. *Weedin*, 23 F.2d 949, the court held that certain stipulations in the treaty of 1828 with Prussia which provided that citizens of the respective states shall have the same security and protection as natives of the country wherein they reside, survived the war between the United States and Germany and were effective in 1927.

former treaties between the United States and the German states. The language of Article 289 is equivocal and uncertain. It is not lightly to be supposed that it was the intention to revive by notice a provision of a treaty which had not been abrogated, or to abrogate a provision which was not incompatible with war and which was for the mutual benefit of the citizens of the parties to the treaty. In the absence of express words to that effect, it is difficult to infer that it was the purpose of the contracting parties to withdraw the privilege of individuals to inherit, which was not incompatible with hostilities, and which the war had not disturbed. We think that Article 289 means that a treaty which had been abrogated by the war could be revived only in the manner therein provided, and that all treaties which had been abrogated by the war and were not so revived "are and shall remain abrogated."

We hold that the provision of the treaty of 1827 with Bremen, so far as it related to the right of citizens of Bremen to inherit, was in force on August 2, 1924, the date of death of Bertha Meyer.

The argument that "if no reciprocal rights of inheritance were in effect on August 2, 1924, then the estate vested in Rolf Jansen in June, 1929, on his entry into the United States and in Irma Martin on her entry [April, 1939]," is without merit. If a nonresident alien does not appear and claim his succession within five years after the death of his ancestor, the property does not go back to the estate nor is it inherited by the other heirs: it vests in the state.[20]

Appellants contend that whatever right or interest the nonresident heirs acquired in the estate "ceased" or was "extinguished" by the execution of their waivers, the effect of which was to renounce the inheritance to which they had succeeded; therefore, since they never had title, there was nothing which could vest in respondent.

While the courts of this state have determined that an heir may sell, assign, hypothecate, or otherwise transfer his inheritance,[21] may make a testamentary disposition thereof,[22] may

[20]*Estate of Pendergast*, 143 Cal. 135, 140 [76 P. 962]; *State* v. *Miller*, 149 Cal. 208, 210 [85 P. 609]; *Estate of Romaris*, 191 Cal. 740, 744 [218 P. 421]; *Estate of Laurence*, 84 Cal.App.2d 500, 505 [191 P.2d 109].

[21]*United States F. & G. Co.* v. *Mathews*, 207 Cal. 556, 559-560 [279 P. 655]; *In re Dobbel*, 104 Cal. 432, 436 [38 P. 87, 43 Am.St.Rep. 123]; *Estate of Michels*, 18 Cal.App.2d 201, 204 [63 P.2d 333]; *Smith* v. *Barrick*, 41 Cal.App. 28 [182 P. 56]; *Carrasco* v. *State*, 67 Cal. 385, 386-387 [7 P. 766].

[22]*In re Dobbel, supra.*

contract with other heirs with reference thereto,[23] and may lose it by adverse possession,[24] so far as we have been able to ascertain, the question of whether an heir succeeding by descent may renounce or disclaim his inheritance has not been determined in this state.

The authorities are in harmony in declaring that heirs cannot prevent the passage of title to themselves by a renunciation or disclaimer. The object of the renunciation was to prevent any part of the estate from passing from the ancestor to the German heirs. ■ A legatee or devisee, under a will, is not bound to accept, but may renounce or disclaim his right under it, if he has not already accepted; and the renunciation or disclaimer relates back to the time the gift was made and no estate vests in him. The rule is different as to a succession by descent. ■ The estate vests in the heir *eo instanti* upon the death of the ancestor; and no act of his is required to perfect title. The estate is cast on the heir by operation of law without regard to his wishes or election. No assent or acceptance is necessary. He cannot, by any act, cause the estate to remain in the ancestor, for the latter is incapable of holding it after his death. ■ He cannot, by any renunciation or disclaimer, prevent the passage of title to himself. Nor can he, by a renunciation or disclaimer, transfer the estate to any other person as the heir of the ancestor, for the object of a renunciation or disclaimer is not to transfer, but to prevent a transfer. He can only make a transfer by some instrument adapted to the transfer of the property.[25] ■ Further, the waivers dated August 22, 1949, were void under the Trading with the Enemy Act, as amended, and the rules and regulations issued pursuant thereto.[26]

We conclude that the so-called waivers were of no legal effect.

The legal result of our conclusions is that former Civil

---

[23]*Baker* v. *Miller,* 190 Cal. 263 [212 P. 11]; *Estate of Gregson,* 96 Cal.App. 767 [274 P. 991].

[24]*Smith* v. *Barrick,* 41 Cal.App. 28, 32 [182 P. 56].

[25]*Bostian* v. *Milens,* 239 Mo.App. 555 [193 S.W.2d 797, 801, 170 A.L.R. 424]; *Coomes* v. *Finegan,* 233 Iowa 448 [7 N.W.2d 729]; *Dueringer* v. *Klocke,* 86 Misc. 404 [149 N.Y.S. 332, 335]; *In re Mahlstedt's Will,* 140 Misc. 245 [250 N.Y.S. 628, 641]; *Watson* v. *Watson,* 13 Conn. 83; *McQuiddy Printing Co.* v. *Hirsig,* 23 Tenn.App. 434 [134 S.W.2d 197, 202]; *Perkins* v. *Isley,* 224 N.C. 793 [32 S.E.2d 588, 591); 4 Page on Wills (Lifetime ed.) 138, § 1401; Williams on Real Property, 1st ed. (American Reprint; star paging) 66, 17th ed. (International) 91, 18th ed. pp. 83, 84, 21st ed. p. 86, 23d ed. pp. 88, 89; Watkins on Descents (1st ed.), pp. 25, 26, (4th ed.) pp. 34, 230.

[26]50 U.S.C.A. App. § 1 et seq.; *In re Muller's Estate,* 104 N.Y.S.2d 133.

Code sections 672 and 1404 were suspended during the life of the treaty, and that Emilie Bredehorst and Hans Jansen succeeded to their respective portions of the estate of Bertha Meyer in the same manner and to the same extent as citizens of the United States. The interests of Emilie Bredehorst and Hans Jansen vested in defendant by virtue of the vesting order of January 20, 1950, and were properly distributed to him.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.