[Civ. No. 16463.   First Dist., Div. Two.   June 27, 1955.]

Estate of AVIL NEPOGODIN, Deceased.   LUBOV I. GOVIADINOFF et al., Respondents, v. THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, Appellant.

Edmund G. Brown, Attorney General, and Wayne D. Hudson, Deputy Attorney General, for Appellant.

Douglas M. Moore for Respondents.

NOURSE, P. J.—The Attorney General of the State of California appeals from a judgment ordering the payment of the residue of the above captioned estate, which had been distributed to the State of California pursuant to section 1027 of the Probate Code, to the attorney in fact of certain first cousins of decedent as his sole heirs and next of kin, and directing said attorney in fact to deposit said residue in a blocked account in a domestic bank to the credit of the heirs and pay out of said account certain fees, fixed by the court, to himself and to the counsel of petitioners.

Avil Nepogodin, a single man, died intestate on January

■■■　　　■■■■■■　　　　■

13, 1949, a resident of the city and county of San Francisco. No person entitled to succeed to his estate appeared in probate and the residue consisting of cash in the sum of $15.427.23 was distributed to the State of California as stated before. The respondents, six first cousins of decedent, by their attorney in fact Edward J. Niedens, timely petitioned for an order directing the payment of said amount to them and for the allowance of reasonable fees to said Edward J. Niedens and to their attorney for services rendered. The attorney general opposed the petition on the ground among others that petitioners were nonresident aliens residing at Harbin, Manchuria, China, under the dominion of the Communist Government of China and that there did not exist on January 13, 1949, or thereafter reciprocal rights of inheritance between citizens of the United States and of China as required by section 259 of the Probate Code,[1] and on the further ground that it could not be shown that they, as heirs, would receive the money as required by section 1354 Code of Civil Procedure.[2]

At the trial before the court without a jury, petitioners with respect to these two points asked the court to take judicial notice of the "Treaty of Friendship, Commerce and Navigation" between the United States of America and the Republic if China, dated November 4, 1946 (63 Stats. at Large, pt. 2, p. 1300), hereinafter called the Treaty, especially of article VIII, subdivision 4 thereof.[3] They likewise asked the

---

[1] At the time of decedent's death section 259 of the Probate Code read in part: ". . . the right of aliens not residing in the United States or its territories to take personal property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents."

[2] At all times herein involved section 1354 of the Code of Civil Procedure read in part: "Whenever any claim is made or petition filed by the representative of an estate or other person, under the provisions of this chapter, or under any other provision of law, to recover money or other property deposited in the State Treasury or held by the State or any officer thereof to the credit, or in the name, of any account in the Unclaimed Property Fund, no recovery will be allowed unless it affirmatively appears that there are heirs or legatees who will receive such money or other property . . ."

[3] Article VIII, subdivision 4, of said treaty reads in part: "The nationals, corporations and associations of either High Contracting Party shall be permitted to succeed, as heirs, legatees and donees, to personal property of every kind within the territories of the other High Con-

court to take judicial notice of, and they introduced into evidence the Foreign Assets Control Regulations, 31 C.F.R. part 500, which require that distributions of property from an estate to a national of China "shall be made by deposit in a blocked account in a domestic bank . . ." (§ 500.523(c)) and which regulate the possibility of transfer from such blocked account pursuant to general or special license. Finally petitioners asked the court to take judicial notice of the fact that Manchuria is within the geographical boundaries of the Republic of China.

The court found with respect to these points in substance that petitioners at the time of the filing of said petition were residents of the Republic of China; that on January 13, 1949, and ever since that date there have existed between citizens of the United States and citizens of the Republic of China pursuant to the above Treaty reciprocal rights to take personal property by succession as required by section 259, Probate Code; that the deposit in a blocked account of the distributive shares of petitioners in accordance with the above Foreign Assets Control Regulations is an actual payment of said funds to petitioners who will be able to secure the release of said funds pursuant to general licenses granted in said regulations or special licenses issued by the Department of Treasury, so that they are heirs who will receive said funds as required by section 1354 of the Code of Civil Procedure; that the reasonable value of the services of the attorney of petitioners was $5,142.61 and of those of Edward J. Niedens $500.

Appellant attacks said findings and the decision on the following grounds. (1) The treaty does not extend to residents of Manchuria and even if it did, it would not prove that a citizen of the United States actually has an enforceable right to receive Manchurian property by succession, the burden of proof of which fact appellant contends is on the claimants under section 259.1 of the Probate Code. (2) The blocking provisions of the Foreign Assets Control Regulations prevent the petitioners from actually receiving their distributive shares, as required, according to appellants, by sec-

tracting Party, left or given to them by nationals of such other High Contracting Party or by nationals of any third country, and shall be permitted to take possession thereof, either by themselves or by others acting for them, and to retain or dispose of it at their pleasure, exempt from any restrictions, taxes or charges other or higher than those to which the nationals, corporations and associations of such other High Contracting Party are or may hereafter be subject in like cases."

tion 1354, Code of Civil Procedure, *supra*, and the licensing provisions of these regulations cannot provide such actual possession. (3) The award of attorney's fees is beyond the jurisdiction of the court, because the compensation of attorneys is left to the agreement of the parties except when specifically provided for by statute (Code Civ. Proc., § 1021) and no such specific provision is applicable to the present situation. We have concluded that said grievances are without merit.

It must be noted from the outset that the provision of the Treaty on which the claimants rely relates only to *nationals* of the contracting parties. ██ There is no evidence or contention that claimants were at any time nationals of China, only that they were *residents*. Therefore the claimants can derive no rights from the Treaty and the rule that such Treaty, as the supreme law of the land, supersedes the provisions of section 259 of the Probate Code which are inconsistent with it (*Clark* v. *Allen,* 331 U.S. 503, 508 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953] ; *Estate of Meyer,* 107 Cal.App.2d 799, 804 [238 P.2d 597]) is not applicable to this case. The only function of the Treaty in this case is that of evidence of the existence of the reciprocity required by section 259, *supra,* for the right of succession of the claimants.

As to the existence of the right of succession the date of the death of decedent is controlling. On the ground that under our law the property of a decedent on his death vests at once by inheritance in his heirs it was held in *Estate of Giordano,* 85 Cal.App.2d 588, 594 [193 P.2d 771], that changes in the substantive law of succession to which sections 259 and 259.1, Probate Code, belong, enacted after the date of death, cannot divest it. The same reasoning supports the decisiveness of that date as to the existence of reciprocity and accordingly the reciprocity was decided as of that date in the California cases. (See for instance *Estate of Arbulich,* 41 Cal.2d 86, 88 [257 P.2d 433].) Although there is no finding to that effect it is undisputed that on the date of death of decedent respondents were residents of Harbin, Manchuria. The first point to be decided is therefore whether the provisions of the Treaty at that time (January 13, 1949) extended to Manchuria, as part of the territory of China. The facts regarding the geographical division and the political history of the world, of which our courts take judicial notice (Code Civ. Proc. § 1875, subd. 8; *Ocean Industries, Inc.* v. *Su-*

*perior Court*, 200 Cal. 235, 241 [252 P. 722]) support the implied finding of the trial court that they did.

During the rule of the dynasty of the Manchus in China (1644-1911) Manchuria formed part of their territory. In the late 19th and early 20th centuries Russia and Japan extended their influence into Manchuria acquiring seaside territories and developing railways. The Russo-Japanese war (1904-1905) was partly fought in Manchuria and over the influence there. In the Treaty of Portsmouth (1905) which ended said war both states agreed to restore Manchuria to China, but nevertheless both retained influence there. The influence of Russia was mainly limited to an interest in the quasi-private Chinese Eastern Railway whereas Japan held another railway and the seaside territories and embarked on the economic penetration of Southern Manchuria. During the Chinese revolution and civil war (since 1911) Japan obtained the controlling influence in Southern Manchuria. At the Peace Conference of Paris in 1919 at the end of the First World War Japan obtained the enlargement of its Manchurian holdings with the former German holdings in Shantung and China therefore refused to sign the Versaille peace treaty with Germany. Although it continued its penetration of Manchuria, Japan, in 1922, was a party to the Washington Nine Power Treaty which provided for the respecting of the sovereignty and territorial integrity of China and for the abstaining from the supporting of individual spheres of interest. The Communist Government of Soviet Russia, which in 1919 had renounced all special privileges acquired by the Tsarist Government, in 1924 insisted on retaining a share in the administration of the Chinese Eastern Railway in Manchuria. In 1927 a conflict between the Soviet Union and China with respect to these privileges led to an invasion of Manchuria by Soviet troops but in December 1929 in negotiations between the Soviet Union and China the *status quo ante* was restored.

In 1931 Japanese troops forcibly occupied Manchuria and the Chinese rule there collapsed. China appealed to the League of Nations, but without practical success: when a report on this matter was unfavorable to Japan, it withdrew from the league. In 1932 it declared Manchuria an independent state under the name Manchoukuo. In 1934 it placed Pu Yi, the last Manchu emperor of China, who as a child had abdicated in 1912, on the throne of Manchoukuo. This puppet government was only recognized by Japan and its Axis partners (and San Salvador). This condition continued during

the undeclared Japanese-Chinese war which broke out in July 1937 and during the Second World War.

The continued Japanese aggression led in 1937 to a united front between the Kuomintang Government under Generalissimo Chiang Kai-shek (which in 1928 had been recognized by the United States as the National Government of the Republic of China) and the Chinese Communists, who since 1927 had been in a state of civil war with the Kuomintang Government. As part of this approach the Chinese Communist Party abolished its Soviet Government and its separate red army, which at least in name was placed under control of the National Government. However, notwithstanding the common fight against the Japanese, military friction between the communists and the government soon broke out again. It continued also when after Pearl Harbor the Chinese-Japanese war had become part of the Second World War.

At the Cairo Conference in November 1943 President Roosevelt, Prime Minister Churchill and Generalissimo Chiang Kai-shek declared that it was their purpose that all territories which Japan had taken from the Chinese, such as Manchuria, should be restored to the Republic of China. The Yalta Agreement (February 11, 1945), to which China was not a party, promised the Soviet Union, which would enter the war against Japan, among other things that the Manchurian railroads should be jointly operated by a Soviet-Chinese Company, that the preeminent interests of the Soviet Union should be safeguarded and that China should retain full sovereignty in Manchuria. On August 9, 1945, the Soviet Union entered the war against Japan. On August 14 a Treaty of Friendship and Alliance between the Republic of China and the Soviet Union was concluded. In separate notes and agreements the advantages promised the Soviet Union at Yalta were granted by China and the Soviet Union pledged that it would respect Chinese sovereignty in the control of all of Manchuria as an integral part of China. On the same date Japan surrendered. The Japanese troops in Manchuria surrendered to the occupying troops of the Soviet Union, which agreed to remove its troops before February 1946. The removal met with some delay so that it took place mainly in April 1946. The conclusion of the Sino-Soviet Treaty improved the willingness of the Chinese Communists to cooperate with the National Government. In a conference of Mao Tse-Tung with the Government in Chungking it was decided in October 1945 that the leadership of President Chiang Kai-shek would be retained,

that at an early date the one party political tutelage of the Kuomintang would be changed to a democratic constitutional government and that a Political Consultative Conference of all parties and nonpartisan leaders would further discuss the measures to be taken. On January 10, 1946, a cease fire agreement was concluded between the government and the communists, of which a provision for the movement of National Government troops into and within Manchuria for the purpose of restoring Chinese sovereignty there formed part. The Political Consultative Conference was in session till the end of January and published resolutions as to all pending problems. Further difficulties between the government and the communists prevented their implementation.

When late in 1945 General Marshall had been appointed Special Representative of the President in China, part of his stated task was to assist the Chinese National Government in transporting Chinese troops to Manchurian ports with American means of transportation and to evacuate Japanese troops; both before and after his arrival such was done on a large scale. However, notwithstanding the stated provision of the cease fire agreement, the arriving government troops met communist resistance in Manchuria. The Soviet troops were not cooperative in having the Chinese Government troops take over, but often arranged their retreat so that the Chinese Communists could take over the parts evacuated and the Japanese war equipment there present. On April 18, 1946, the Chinese Communists occupied Changchun, the former capital of Manchoukuo, and not long thereafter Harbin. On May 23, 1946, Changchun was captured by government troops, who from there continued their march north and east into territory where the communists predominated. On June 6, 1946, a temporary truce as to Manchuria was concluded between the government and the communists, the government reserving its right under the Sino-Soviet Treaty to take over the sovereignty of Manchuria and on June 26, 1946, an agreement for cessation of all hostilities in Manchuria was reached; however, hostilities flared up again. On October 11, 1946, government troops took Kalgan, an important communist center in northern China. Pending negotiations and increased fighting between communists and government troops also in Manchuria, the government troops mainly advancing, the Treaty of Friendship, Commerce and Navigation between the United States and the Republic of China was signed on November 4, 1946. It was to enter into force on the day of exchange of ratifications,

(which took place on November 30, 1948) and was to continue in force for a minimum period of five years from that day. The negotiations between the government and the communists ended in November 1946. On February 1, 1947, the Central Committee of the Chinese Communist Party declared that the party would not recognize any of the loans, treaties and agreements established by the Chinese Kuomintang Government after January 10, 1946, which had not been passed by the Political Consultative Conference. When in 1947 the civil war fighting was resumed on a large scale, the government, though winning much ground in other parts, weakened in Manchuria so that it held there only some main points, the railway communications of which were cut by the communists. During 1948 all of Manchuria with all government troops there fell to the communists. Also in other parts of China the government lost heavily so that in the beginning of 1949 its position was critical although it still held many of the main cities like Peking, Nanking, Shanghai, and Canton.

Most of the above historical facts are found in a voluminous book "United States Relations with China, with Special Reference to the Period 1944-1949," released by the State Department in August 1949. It may be noted that the map which forms part of this book shows the Manchurian provinces as part of China. From these facts it must be concluded that at all times involved in this case, from the signing of the Treaty on November 4, 1946, to the death of decedent on January 13, 1949, Manchuria was an integral part of China. There might have been some doubt in this respect during the existence of the unrecognized Japanese puppet state of Manchoukuo, but that doubt disappeared with the surrender of Japan, the occupation of Manchuria by the Soviet Union, the recognition by the Soviet Union of the sovereignty of China over Manchuria and the withdrawal of the Soviet troops from Manchuria, all prior to the period here involved. It is evident that the Kuomintang Government, the Chinese Communist and the United States Government equally favored the unity of China with the inclusion of Manchuria as a sovereign nation, and that all foreign states so recognized it at the time in question.

As to China as a whole we must hold that the Treaty was in force on January 13, 1949. The exchange of ratification which made it effective had taken place only one and a half months before. At that time the same civil war and the same weakened National Government had existed in China as on the above date of death of the decedent herein men-

tioned. The ratification exchange shows that the United States Government did not then consider the conditions existing in China an unsurmountable obstacle to the effectiveness of the Treaty. It had not denounced the Treaty at the date of decedent's death. ■ As to the ability of a foreign state to perform its treaty obligations and as to the question whether a treaty has been terminated the action of the political departments of our government is controlling. (*Clark* v. *Allen*, 331 U.S. 503, 514 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953]; *Terlinden* v. *Ames*, 184 U.S. 270, 285, 288 [22 S.Ct. 484, 46 L.Ed. 534].) In *Clark* v. *Allen* it was held that the fact that Germany after its defeat in the Second World War was under Allied occupation could not be considered by the court to have terminated a treaty between that country and the United States concerning the right to succession to real property when there was no evidence that the political departments had so considered it. The same must apply *a fortiori* to the civil war in China.

Appellant's contention that the scope of the Treaty is limited to the territory over which the Nationalist Government of China under Chiang Kai-shek had effective control is without merit. When article XXVII of the Treaty, on which appellant relies, provides that the Treaty shall extend to "all areas of land and water under the sovereignty or authority of either High Contracting Party, except the Panama Canal Zone" the parties referred to are the two states as such, not their governments of the moment. ■ Treaties are contracts between sovereign states and are binding on those states even when the government and its form change. (See Oppenheim Lauterpacht International Law, 7th ed., pp. 791, 795, 830; Draft Convention on the Law of Treaties, § 24 and comment, 29 A.J.I.L.Supp. 1044; V Hackworth Digest of International Law 360 et seq.; II Hyde International Law 1528; *Ivancevic* v. *Artukovic*, 211 F.2d 565, 566.) At the time in question, there was only one sovereign Chinese state although it was in a condition of civil war. The Chinese Communists were a Chinese political party taking part in the civil war, but they had not seceded from the Chinese state. It is a wholly unacceptable proposition, not supported by any authority, that with every change in the fortunes of a fluid civil war, the territory of the state and the sphere of applicability of its treaties should change.

With respect to the scope of the Treaty the court cannot attach any significance to the fact that the Chinese Communist

Party has declared after the signing and before the ratification of the Treaty that it would not recognize it. It is very doubtful whether our courts can consider even the formal denunciation by a foreign state of a treaty to which the United States is a party so long as the political departments of our government have not conceded its termination (*Terlinden* v. *Ames, supra,* 184 U.S. 270, 287 [22 S.Ct. 484, 46 L.Ed. 534] ; The Legal Nature of Treaties, 10 A.J.I.L. 722). Certainly, the adverse declaration of a party to a continuing civil war, which declaration did not halt the ratification of the Treaty by our government, can have no effect on our decision as to the Treaty.

The next question is whether the Treaty sufficiently proved the existence of the right of citizens of the United States to take in China personal property by succession upon the same terms and conditions as Chinese residents and citizens as required by section 259, Probate Code, *supra*. It is undisputed and undisputable that the Treaty provides for such right. However, appellant contends that it does not prove the actual existence of such right because of the absence of proof of the construction and application of the Treaty by the Chinese Government and of the enforceability of the right under it so that American citizens would actually receive their inheritance. ■ Appellant restricts his contention to Manchuria, but we are of the opinion that "country" in section 259, Probate Code, means state and that so long as there is no stabilized secession of a part of a state the decision as to reciprocity must be based on the conditions in the foreign state as a whole and not on temporary conditions in the specific locality or province of which the claimants are residents. At the time here controlling (January 13, 1949) there existed no separate and stabilized "Communist Government of China" as alleged in appellant's answer. Only on September 21, 1949, did Mao Tse-Tung proclaim the People's Republic of China in Peiping, which government was first recognized by the Soviet Union on October 2, 1949. The situation must be viewed as of January 13, 1949, not by hindsight. ■■ Treaties may be considered as evidence of foreign law (*Estate of Arbulich, supra,* 41 Cal.2d 86, 89 [257 P.2d 433]) and the Treaty in this case was at least prima facie proof that one and a half months after its effective date it represented the law in China. ■ It is a recognized rule of international law that "A State is bound to carry out in good faith the obligations which it has assumed by a treaty.

(Pacta sunt servanda.)'' (Draft Convention on the Law of Treaties, art. 20, with comment, 29 A.J.I.L.Supp. 977; I Oppenheim Lauterpacht. International Law, 829; V Hackworth Digest of International Law, 164.) There are rebuttable presumptions that the law has been obeyed (Code Civ. Proc., § 1963, subd. 33) and that official duty has been regularly performed (Code Civ. Proc., § 1963, subd. 15), which the trial court could accept as evidence. For the rule that a presumption can constitute evidence as to reciprocity, see *Estate of Kennedy,* 106 Cal.App.2d 621, 625 [235 P.2d 837]. There was no proof or even contention in the trial court that the attitude of the recognized National Government of China or the domestic law of China on the point involved were at the time in question violative of the Treaty and we know in that respect of no facts of which the court should take judicial notice. It is true that the existence of a state of civil war may have impeded in many parts of China the effective enjoyment of the reciprocal rights but such circumstances need not be considered decisive. In *Estate of Blak,* 65 Cal.App.2d 232, 238 [150 P.2d 567], the effect of the occupation of the Netherlands by the Germans was under consideration and it was held ''That the exigencies of war may temporarily suspend or defer the remedy to enforce the right to receive does not militate against the right.'' The trial court could apply the same rule to the exigencies of the civil war. ██ ''A finding by the trial court on the issue of reciprocity is to be treated like a finding on any other issue of fact and if there is evidence to support it such finding will not be disturbed on appeal.'' (*Estate of Arbulich, supra,* 41 Cal.2d p. 90 [257 P.2d 433].) On that basis we must sustain the finding of reciprocity in this case.

██ At the oral argument appellant has abandoned the contention that under the provision of section 1354, Code of Civil Procedure, *supra,* the federal requirement that distribution to the claimants must be made by deposit in a domestic bank prevents their recovery. Correctly so. Section 1354, Code of Civil Procedure, does not require proof that the heirs will receive the property, immediately, free from restrictions, in the country of their residence. ██ We understand the purpose of the provision to be the prevention of futile proceedings with respect to deposited property for which no entitled heirs are actually in existence (*Estate of Zimmermann,* 132 Cal.App.2d 702, 708 [283 P.2d 68]; *Estate of Costa,* 109 Cal.App.2d 735, 741 [241 P.2d 621]).

Such purpose does not require acquisition free of restrictions. It is undisputed that claimants are decedent's next of kin and sole heirs at law and we have decided that they are not excluded from succession by section 259, Probate Code. The Foreign Assets Control Regulations do not divest the title of these claimants to their distributive shares when deposited in a blocked account and do not prevent them from all enjoyment of them. When the owner of a blocked account comes into the United States he can pay from it for living, traveling and similar expenses within the United States (§ 500.518). (There was a statement at the trial that two of the claimants had left China for Brazil and might come to the United States.) Section 500.521 permits remittance of $100 per calendar month to each blocked account holder or member of his household, by means of crediting the amount to be transferred to a blocked account in the name of a banking institution in China. The finding that the claimants will receive the property so as to satisfy the requirement of section 1354 of the Code of Civil Procedure must be upheld.

The question whether the trial court was entitled to fix the salary of respondents' attorney cannot be reviewed on this appeal by the state. The judgment orders the state to pay over to the attorney in fact of the claimants all that had been distributed to it, and said attorney in fact to pay the fixed salary to respondents' counsel. What happens to the money after the state has paid it out is of no concern to the state so that the state cannot be aggrieved by that part of the judgment. The claimants are the only parties interested and they do not appeal. An appellant is entitled to review of error only which injuriously affects him and cannot urge error which affects others who do not appeal. (*Nichols* v. *Nichols*, 135 Cal.App. 488, 491 [27 P.2d 414]; 3 Witkin, California Procedure, 2228; and compare *Ribero* v. *Callaway*, 87 Cal.App.2d 135, 139 [196 P.2d 109].)

The interest which the state claims on the ground that money deposited in a blocked account might escheat again is too remote to constitute the state a party aggrieved. If such were accepted the state would be a party aggrieved in all decisions adverse to a resident of the state.

Judgment affirmed.

Dooling, J., and Kaufman, J., concurred.